[No. 10638-1-III. Division Three. January 22, 1991.]

EVELYN A. McCANN, *Appellant,* v. WASHINGTON PUBLIC POWER SUPPLY SYSTEM, ET AL, *Respondents.*

*Lowell C. Barber,* for appellant.

*Michael J. Davidson, George Fearing,* and *Leavy, Schultz & Sweeney,* for respondents.

SHIELDS, A.C.J.—Summary judgment was granted in favor of Washington Public Power Supply System and John Hancock Mutual Life Insurance Company, denying certain life insurance benefits to Evelyn McCann, the beneficiary of her husband's life insurance policies. Ms. McCann appeals, contending summary judgment should not have been granted because there were genuine issues of material fact concerning: (1) what terms controlled the optional life insurance program at the time Mr. McCann enrolled in November 1988; (2) the meaning of the phrase "actively at work" as that term was used in the basic life insurance policy; (3) whether the Supply System was an agent of John Hancock; and (4) whether the Supply System and John Hancock violated the Consumer Protection Act. We reverse and remand for trial.

William M. McCann was employed as an engineer for the Supply System. On September 14, 1988, Mr. McCann went on "short–term disability" status due to cancer. On September 17, 1988, Mr. McCann was promoted from lead designer to design group supervisor. At the time of the promotion, Mr. McCann was listed as an "active" employee. Mr. McCann continued to be paid his salary throughout his "short–term disability". Judy Amacker, administrator of

employee benefits,[1] told Mr. McCann's supervisor to continue noting Mr. McCann as sick or on vacation until Mr. McCann returned to work.

One of Mr. McCann's benefits as an employee of the Supply System was "basic" life insurance underwritten by John Hancock, premiums for which were paid by the Supply System. Each employee received life insurance in the face amount of twice his annual salary. When Mr. McCann received his promotion, his annual salary increased from $44,560 to $47,847. His insurance eligibility increased by $7,000, from $89,000 to $96,000. However, an employee's benefit handbook which each employee was issued described the basic insurance program; it provided on page D/1:

> Should you be disabled and not actively at work when your coverage would otherwise be effective, your coverage will begin on the first day you are actively at work.

and on page D/3:

> If your salary increases or decreases, the coverage amount will change automatically effective on the date of such salary action. However, if you are not actively at work when your salary changes, there will be no change in your insurance amount until you return to work.

In October 1988, "Comp Talk", the intracompany newsletter on employee benefits and compensation, announced the availability of an optional life insurance program, under which the employee was to pay the premium. Optional insurance in the amount of one or two times base annual salary could be obtained. The publication stated, "This added insurance has only one exclusion—death as a result of suicide." In November 1988, "Comp Talk" again

---

[1]Ms. Amacker's job description states she "is the primary contact with the carriers' claims processing staff *and frequently makes final and binding decisions regarding the interpretation of policy to maximize uniform and equitable administration and utilization of the plan.*" Further, her position "involves . . . detailed communications with the carriers . . . necessary to achieve uniformity and equity in a very complex field that by its nature *requires constant administrative interpretation.*" (Italics ours.)

announced the optional life insurance program, indicating it would become effective December 24, 1988. The front page of that issue of "Comp Talk" stated in boldface print:

**Secretaries, supervisors and managers—**
**We appreciate your extra efforts in making sure all your employees get new enrollment forms as early as possible during the open enrollment period.** *Please remember those employees on medical and personal leaves.*

(Italics ours.) Sometime in November 1988, Mr. McCann applied for $48,000 optional life insurance. Premiums for this optional life insurance were immediately deducted from his paycheck. During the open enrollment period, Ms. Amacker was given no addendum to the basic life insurance policy which covered optional life insurance, nor any correspondence which specified requirements for optional life insurance from John Hancock.

On January 3, 1989, Mr. McCann died. Although he never returned to work, he had never been placed on "long-term disability" status, nor had he ever been terminated. On January 13, Ms. Amacker wrote a letter to Ms. McCann indicating Mr. McCann had $96,000 basic life insurance, and $48,000 optional life insurance. That same day, Ms. Amacker filed a death claim with John Hancock, again indicating Mr. McCann had $96,000 basic life insurance, effective September 17, 1988, and $48,000 optional life insurance, effective December 24, 1988. On March 24, 1989, John Hancock informed the Supply System it would only pay $89,000, citing employee handbook pages D/1 and D/3, above, as the reasons for denying the extra $7,000 basic life insurance and the full $48,000 optional life insurance. On April 4, 1989, the Supply System submitted a second death claim to John Hancock, making a claim for only $89,000. On April 25, the Supply System sent Ms. McCann a refund of the premiums for optional life insurance which had been deducted from Mr. McCann's paychecks. On June 27, Ms. McCann commenced suit against John Hancock and the Supply System. On September 15, the Supply System sent a refund of premiums to another Supply System employee,

Karen Butler. Ms. Butler had also applied for optional life insurance during the open enrollment period while she was on short–term disability. The Supply System refunded the premiums once this suit had commenced and it became aware of John Hancock's position that employees would not be eligible for optional life insurance if they applied while on short–term disability leave.

On October 27, 1989, John Hancock sent the Supply System an addendum to the basic life insurance policy. The addendum, which purported to be effective on and after December 24, 1988, included optional life insurance provisions:

> Coverage or an increase will become effective on the first day of the calendar year following the open enrollment period provided the employee is actively at work . . ..

and

> *To increase the level of "Optional Life Insurance" an employee must submit evidence of insurability satisfactory to the insurer* and without expense to it. The increase will become effective on the date of approval by the insurer, provided the employee is actively at work on a regulary [*sic*] scheduled, full–time basis, otherwise on the first date thereafter the employee returns to active work with the Employer.

(Italics ours.) The addendum also appeared to clarify terms in the basic life insurance policy:

> Any change in amounts of an employee's insurance resulting from change in earnings or classification, shall become effective on the date of such change; provided, that an increase in the employee's amount of insurance shall become effective on that date only if he is then actively at work with his Employer *on a regular scheduled, full–time basis,* otherwise the increase shall become effective on the first date thereafter on which he is actively at work with his Employer.

(Italics ours.)

On November 30, 1989, John Hancock and the Supply System, respectively, filed motions for summary judgment. On December 8, Ms. McCann moved to amend her complaint. At a hearing, the court denied Ms. McCann's motion and granted John Hancock's and the Supply System's motions.

First, Ms. McCann argues the terms of the optional life insurance premium, in the absence of an issued policy or addendum to an existing policy, are those disclosed in "Comp Talk" in October and November 1988. John Hancock and the Supply System argue, on the other hand, the terms of the optional life insurance program are those in the addendum issued almost a year later in October 1989, citing *Webster v. State Farm Mut. Auto. Ins. Co.*, 54 Wn. App. 492, 774 P.2d 50, *review denied*, 113 Wn.2d 1018 (1989).

We find several material questions exist as to the optional life insurance coverage: (1) Was the addendum to the policy in existence at the time the employees enrolled for optional life insurance in November 1988?[2] (2) If the addendum was not in existence at that time, (a) were the terms of the preexisting basic life insurance policy (and the employee handbook which explained the basic life insurance provisions) applicable to the optional life insurance or (b) were the terms of the optional life insurance program simply those stated in "Comp Talk", *i.e.*, once an employee made a premium payment, he was covered if he thereafter died other than by suicide?

Second, Ms. McCann argues an ambiguity exists as to both the optional and the increased basic life insurance coverage because the meaning of the phrase "actively at work" is unclear. We agree material questions exist as to the meaning of that phrase. It is apparent the phrase created confusion, even as to Ms. Amacker, who was responsible for interpreting and implementing the policy. In a recent Georgia case, *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.*, 894 F.2d 1555 (11th Cir. 1990), the

---

[2]*Webster* is inapplicable, because that case involved only the nondelivery of a policy which was in existence at the time the insureds applied for coverage. Here, it is questionable whether the optional life insurance addendum even existed at the time Mr. McCann enrolled for optional life insurance. As stated above, Ms. Amacker testified she received no correspondence from John Hancock at the time of the open enrollment which indicated an addendum concerning optional life insurance was in existence or would be forthcoming.

court found the phrase "actively at work" ambiguous, and resolved the provision in favor of coverage for the employee. The employer in *United of Omaha,* as here, considered an employee on "short–term" disability if he was out of work for less than 6 months; treated an employee on short–term disability, who remained on the payroll and continued receiving benefits, as an "active" employee; and only converted an employee to "inactive" status once he had converted from short–term to long–term disability. *United of Omaha,* at 1560–61, 1565. *See also Mutual of Omaha Ins. Co. v. Chadwell,* 426 F. Supp. 550 (N.D. Ill. 1977) which held employees who are unable to work due to temporary disability are not inactive for purposes of insurance policy, noting "active work has not ceased but has only been suspended." *Mutual of Omaha,* at 553 n.2. In the present case, Mr. McCann was always considered to be on short–term disability leave, which is not defined in the record before us, and continued receiving his paychecks and benefits. He continued on a suspended active status as such or on vacation, and even received a promotion during this time period. Thus a genuine issue of material fact exists as to whether he was "actively at work."[3]

Third, Ms. McCann argues the Supply System and its employee, Ms. Amacker, were agents of John Hancock. The

---

[3]The Supply System admits the term "actively at work" was not defined in the record which was before the Superior Court, nor in the record before us on appeal. The Supply System moved, after oral argument on appeal, to supplement the record to include the entire employee handbook, which contains a definition of "actively at work" on page J/4. Because the case is being remanded for trial, we denied the motion to supplement. We note, however, that the definition of "actively at work" as provided on page J/4 raises further issues of material fact which must be resolved at trial. The definition states in part: "an employee shall be considered 'actively at work' . . . if at any time on the date in question, he is neither (i) hospital confined, nor (ii) disabled to a degree that he could not then have reported to a place of employment outside of his home and performed all of the usual and customary duties of his occupation on a regular, full–time basis." Thus it must be determined whether, on both the date Mr. McCann received his increase in pay and the date he enrolled for optional life insurance, he was hospital confined or disabled to such an extent he could not have reported to work and performed all of his duties.

Supply System and John Hancock contend on the other hand, no agency existed. In the alternative they argue even if agency were found, Ms. McCann is precluded from arguing coverage existed based on the theory one may not, by invoking the doctrine of estoppel or waiver, bring into existence a contract not made by the parties. *Carew, Shaw & Bernasconi, Inc. v. General Cas. Co. of Am.,* 189 Wash. 329, 336, 65 P.2d 689 (1937). They also contend acceptance of premiums does not create coverage, citing *Nordean v. Life Ins. Co. of North Am.,* 37 Wn. App. 106, 678 P.2d 366, *review denied,* 101 Wn.2d 1021 (1984).

Whether an employer/policyholder is an agent of the insurer is a question which has been litigated throughout the country with mixed results. *See* 44 Am. Jur. 2d *Insurance* § 1851 (1982). California and Oregon have generally held the employer is an agent of the insurer. *See Bass v. John Hancock Mut. Life Ins. Co.,* 10 Cal. 3d 792, 581 P.2d 1147, 112 Cal. Rptr. 195 (1974); *Paulson v. Western Life Ins. Co.,* 292 Or. 38, 636 P.2d 935 (1981). There is an extensive review of the subject in Comment, *Group Insurance; Agency Characterization of the Master Policy–Holder,* 46 Wash. L. Rev. 377 (1971). *United of Omaha* found an agency relationship between the employer/policyholder and the insurer. In that case the court held an employer is the agent of the insurer in determining which persons are (1) its employees, (2) eligible to participate as a member of the group, (3) regularly performing their duties and (4) employed full time. The court stated:

> [T]he employer who obtains a group insurance policy covering its employees is the agent of the insurance company for every purpose necessary to make effective the group policy, and thus the insurance company has imputed knowledge of facts which the employer knows.

*United of Omaha,* at 1558 (quoting *Dawes Mining Co. v. Callahan,* 246 Ga. 531, 533–34, 272 S.E.2d 267 (1980)). This led to the next question, whether the employer had been negligent as an agent when it determined an employee on short–term disability was eligible for enrollment in an

optional life insurance program. The court observed a jury could find the employer was not negligent, but reasonably confused by the phrase "actively at work" when determining whether an employee on short–term disability was eligible for coverage. *United of Omaha,* at 1560.

Several other jurisdictions have likewise found the employer to be the insurer's agent. *See Martz v. Union Labor Life Ins. Co.,* 757 F.2d 135 (7th Cir. 1985); *Pearce v. General Am. Life Ins. Co.,* 637 F.2d 536 (8th Cir. 1980). This presents a material issue of fact: whether an employer/ policyholder is the agent of the insurer.

 *Paulson,* 292 Or. at 44, provides guidance for determining whether agency exists:

> Our analysis of the decisions convinces us that many courts, even though they purport to apply a "majority rule" or a "minority rule," actually base their decision upon the facts relating to the division of functions between the insurer and the employer–policyholder, and that any "majority" or "minority" rule is more apparent than real. It is more correct to say that when the plan is exclusively administered by the insurer, as a matter of law no agency relationship exists between the insurer and the employer. But if the employer performs all of the administration of the policy, an agency relationship exists between the insurer and the employer, as a matter of law. Between these two extremes, as the division of functions becomes less separate, or to put it another way, as the employer assumes responsibility for more administrative or sales functions which are customarily performed by an insurer, a question of fact will arise as to the agency relationship between the insurer and the employer.

The Comment in 46 Wash. L. Rev. 377, at 408–09, suggests an equitable, rather than an agency approach, using the following guidelines:

> It is submitted that the courts should consider closely the facts of each case to determine whether the insurer *should* be held responsible for the acts of the master policyholder, instead of approaching the cases from a standpoint of whether or not the master policyholder is the agent of the insurer in performing certain functions. That is the courts should look at the equities of the situation rather than the agency position of the parties.
>
> In executing this approach, certain factors should be kept in mind:

1. The insurer rather than the insured is in a better position to control the conduct of the master policyholder.

2. The insurer is in a better position to recoup some of the losses occasioned by the master policyholder's conduct. . . .

3. It should be determined whether, under the circumstances, the insured was justified in his reliance that he was in fact covered by the terms of the policy.

4. It should be recognized that to the insured the group insurance contract is one of adhesion which he must accept as is.

5. It should be borne in mind that the institution of group insurance will lose some of its usefulness if its image can be tarnished by poor administration.

(Footnote omitted.)

Here, a material question of fact exists whether the Supply System performed most of the administration of both the basic and the optional life insurance policies, thus establishing an agency relationship as a matter of law.[4]

Fourth, Ms. McCann argues John Hancock and the Supply System violated RCW 48.30.190(1),[5] WAC 284–30–330, WAC 284–30–370 and WAC 284–30–380. If the Supply System is found to be an agent of John Hancock, its collection of premiums could be imputed to John Hancock, thus potentially creating a violation of RCW 48.30.190. We also note, if John Hancock is found to have violated even one of the nine subsections of WAC 284–30–330, Ms. McCann may be able to prove a violation of the Consumer Protection

---

[4]*Carew* is inapplicable. In *Saunders v. Lloyd's of London,* 113 Wn.2d 330, 779 P.2d 249 (1989), the court cited the general rule in *Carew,* but noted the underlying rationale for the rule is an insurance company should not be required to pay for a loss for which it received no premium. Such is not the case here. *Nordean* is distinguishable on its facts. In *Nordean,* there was a specific commencement date for coverage. Premiums were collected for insurance which was to be provided in due course. Here, premiums were collected for optional life insurance, which was never provided in due course. There also remains a question of fact whether the Supply System paid increased premiums for additional basic life insurance for Mr. McCann even though Mr. McCann was never provided additional basic life insurance coverage.

[5]RCW 48.30.190(1) provides:

"No person shall wilfully collect any sum as premium for insurance, which insurance is not then provided or is not in due course to be provided by an insurance policy issued by an insurer as authorized by this code."

Act. *See Industrial Indem. Co. of the Northwest, Inc. v. Kallevig,* 114 Wn.2d 907, 792 P.2d 520 (1990).

Finally, Ms. McCann contends the court erred by denying her motion to amend her complaint. We need not address this contention; the motion, or an amendment of it, can be renewed pretrial on remand.

The decision of the Superior Court is reversed and the case remanded for trial.

MUNSON and THOMPSON, JJ., concur.