[No. 22794-4-III.   Division Three.   February 3, 2005.]

SUEANNE RIZZUTI, ET AL., *Appellants*, v. BASIN TRAVEL SERVICE OF OTHELLO, INC., ET AL., *Respondents*.

*Michael J. Hines* (of *Lukins & Annis, P.S.*), for appellants.

*Russell C. Love* (of *Thorsrud, Cane & Paulich, Inc., P.S.*), for respondents.

¶1 SCHULTHEIS, J. — Maryanne Rizzuti died in an airplane crash during a safari trip to Africa. Basin Travel Service of Othello, Inc., the travel agency that booked the trip, provided automatic transportation insurance through Travel Insured International, Inc., (TII) and Travelers Indemnity Company Hartford, Connecticut, for clients whose tickets were issued by the agency. Ms. Rizzuti's

heirs[1] sued for recovery under the policy and damages for bad faith and Consumer Protection Act (CPA), chapter 19.86 RCW, violations when TII denied coverage. The trial court granted the defendants' motion for summary judgment dismissal of the complaint with prejudice.

¶2 The heirs appeal, contending the word "issued" was not defined in the travel insurance policy and should be given its plain meaning to cover all tickets booked and purchased through Basin. They also argue that TII breached a duty of good faith and the CPA by denying coverage and by failing to adequately investigate their claim. Because we find neither error in denying coverage nor bad faith in TII's actions, we affirm.

FACTS

¶3 In early 1999, Ms. Rizzuti contacted Cheryl Kresge, the owner of Basin, about booking travel on the Livingstone Safari, a package tour of Africa arranged by Abercrombie & Kent International (A&K), an Illinois based tour operator. The Livingstone Safari included round trip airfare from Los Angeles and all transportation, accommodations, and meals during the 15-day tour of Africa. Basin arranged for Ms. Rizzuti's flights from Pasco to Los Angeles and back.

¶4 At the time, Basin had a travel insurance policy with TII (underwritten by Travelers Indemnity Company). Previous owners of Basin had entered into the insurance agreement with TII in 1986. The policy provided $100,000 of automatic transportation coverage for loss of life, limbs, or sight occurring on a "ticketed trip," provided the ticket was issued by Basin. Clerk's Papers (CP) at 248. Every ticket issued by Basin was accompanied by a "Memorandum of Insurance" that included the above provisions and concluded with the following:

> Send written notice of claim to Travel Insured International, Inc., P.O. Box 280568, East Hartford, CT 06128-0568.

---

[1] Ms. Rizzuti's heirs were her three adult children, Sueanne Rizzuti, John R. Rizzuti, and Laura Stredwick.

Keep this summary with your important insurance papers. It is your coverage description of the Blanket Travel Policy A-6198. All information contained on this summary is subject to the terms and conditions of the Policy.

CP at 248. Basin paid $.12 per ticketed client per ticketed trip as a premium for the coverage.

¶5 Ms. Rizzuti paid for about half of the African tour with a cashier's check made out to Basin and made the final $5,764 payment on her American Express card so as to obtain travel insurance through American Express.[2] Ms. Kresge deposited the cashier's check in the Basin account and then sent the payment to A&K, minus her commission of $1,974. Using A&K's charge form, she arranged for Ms. Rizzuti to pay A&K directly the $5,764 with her American Express card. Basin issued the Pasco to Los Angeles round trip tickets with its office machine in May 1999. These tickets were given to Ms. Rizzuti with the memorandum of insurance. The African safari tickets were issued by A&K and sent to Basin in August 1999. Ms. Kresge distributed these tickets to Ms. Rizzuti separately, without the memorandum of insurance.

¶6 The Livingstone Safari included a flight between Nairobi, Kenya, and Arusha, Tanzania, that A&K chartered on Northern Air. Ms. Rizzuti and all other passengers and crew were killed in early September 1999 when the Northern airplane crashed into Mount Meru.

¶7 On May 1, 2000, attorney Michael Hines, representing Ms. Rizzuti's estate, sent a letter to Ms. Kresge stating, "It has come to our attention that travel bookings through your office, such as Maryanne Rizzuti's, automatically trigger travel insurance protection and coverage." CP at 244. Mr. Hines asked Ms. Kresge to immediately process Ms. Rizzuti's insurance benefits or to help her estate to do so. He also requested a copy of Ms. Rizzuti's entire travel file and any information about the travel insurance, "including

---

[2] Basin arranged the African tour for both Ms. Rizzuti and her traveling companion, Norman Dolan. The cashier's check for $10,000 paid roughly one-half of the total $21,392 owed by both travelers for the safari.

the underlying insurance policy, enrollment documentation, processing and claims procedures, etc." CP at 244.

¶8 Ms. Kresge responded in a letter dated May 15, 2000. She stated that the automatic transportation insurance applied to all tickets issued in her office, but noted that the African flight tickets were issued by A&K. She also wrote that she had already given Ms. Rizzuti's travel file to Ms. Rizzuti's daughter, Sueanne Rizzuti. Ms. Kresge apparently did not send additional information on the travel insurance.

¶9 Mr. Hines's next letter to Ms. Kresge, dated July 21, 2000, indicated that he had contacted A&K and determined that Basin "booked" the African flight tickets. CP at 246. On that basis, he asked Ms. Kresge "to reconsider your position with respect to whether Maryanne Rizzuti's death is covered by Basin Travel's Travelers Insurance policy." CP at 246. In the event Ms. Kresge did not change her position, he asked her to send him the insurance policy so he could make "an independent assessment of the coverage issue." CP at 246. Ms. Kresge briefly responded by letter dated August 2, 2000 that she was enclosing the memorandum of insurance. She told Mr. Hines to let her know if he had further questions and concluded by stating, "I am doing everything in my power to help the Rizzuti family." CP at 247.

¶10 After reviewing the memorandum of insurance, Mr. Hines again wrote Ms. Kresge on October 17, 2000. He expressed his conviction that Ms. Rizzuti was covered by the travel insurance because (1) Basin booked the African tickets; (2) Ms. Rizzuti paid Basin for the tickets; (3) the insurance premium was included as part of the ticket price; and (4) Basin received a commission for booking the tickets. He concluded by stating, "In the event we do not receive the full $100,000 insurance proceeds within 30 days, the estate of Maryanne Rizzuti will pursue all of its legal options, including commencing litigation." CP at 249. Ms. Kresge sent this last letter to Dan O'Connell, claim manager of TII, who wrote a letter to Mr. Hines dated January 24, 2001. Mr.

O'Connell stated that Ms. Rizzuti paid no premium for her coverage under the automatic transportation policy. He denied coverage by stating as follows:

> It is my understanding that the South African Airways tickets were purchased through Abercrombie and Kent International as part of their package. Since those tickets were not purchased through Basin Travel[,] coverage under the Travelers' Automatic Flight policy does not apply and no benefits are payable.

CP at 254.

¶11 On August 7, 2002, Mr. Hines deposed Ms. Kresge in relation to a lawsuit brought by Ms. Rizzuti's heirs against American Express. Although Ms. Kresge admitted that the African safari package was "booked" through Basin, she noted that A&K arranged all flights, other transport, meals, and accommodations for the African tour, which began and ended in Los Angeles. CP at 195, 199. In several questions to Ms. Kresge, Mr. Hines referred to the safari tickets "issued" by Basin. CP at 199-200. Ms. Kresge did not correct this reference. However, when asked if Basin issued travel insurance for the tour, she replied, "Not in connection with this trip. We give automatic flight insurance, $100,000, for the tickets that we actually issue in our office, so [Ms. Rizzuti] did purchase a ticket from Pasco, Washington to Los Angeles to connect on this trip." CP at 202.

¶12 One week after the deposition, Mr. Hines sent a letter to Ms. Kresge and to TII. He stated that Ms. Kresge testified under oath at the deposition that the ill-fated African flight was "booked and issued" by Basin, which received a commission for booking and issuing the ticket. CP at 43. Demanding immediate tender of the policy proceeds, Mr. Hines added that he would file an attached complaint if he did not receive a commitment by August 23, 2002. Mr. Hines filed the summons and complaint against Basin, TII, and Travelers Indemnity on August 28. Norman Novotny, vice-president and general counsel of TII, sent a letter to Mr. Hines on August 29 stating that he had just received Mr. Hines's letter after returning from a trip and

that he would respond within the next two weeks. In a response dated August 30, Mr. Hines agreed to defer service of the complaint on TII until after he and Mr. Novotny had had an opportunity to discuss the case.

¶13 The complaint filed by the Rizzuti heirs (the Rizzutis) alleged breach of the insurance contract, breach of a duty of good faith, and CPA violations. In October 2003, the defendants filed a motion for summary judgment dismissal of the complaint. The Rizzutis filed a cross motion for summary judgment in November. By order filed on January 8, 2004, the trial court granted the defendants' motion for summary judgment and denied the Rizzutis' cross motion for summary judgment. The Rizzutis' claims were dismissed with prejudice. They timely appeal.

COVERAGE UNDER THE AUTOMATIC TRANSPORTATION POLICY

¶14 The Rizzutis first contend the trial court erred in concluding as a matter of law that Ms. Rizzuti's death was not covered by the automatic transportation policy. We review the order of summary judgment de novo, performing the same inquiry as the trial court. *Smith v. Safeco Ins. Co.*, 150 Wn.2d 478, 483, 78 P.3d 1274 (2003). Considering all facts and inferences in the light most favorable to the Rizzutis, we will affirm summary judgment if there is no genuine issue of material fact and if the defendants are entitled to judgment as a matter of law. *Anderson v. State Farm Mut. Ins. Co.*, 101 Wn. App. 323, 329, 2 P.3d 1029 (2000).

¶15 Interpretation of an insurance policy is a question of law. *Overton v. Consol. Ins. Co.*, 145 Wn.2d 417, 424, 38 P.3d 322 (2002). The terms of a policy are given a fair and reasonable construction that would be given to the contract by the average person buying insurance. *Id.* Definitions provided in the policy are controlling. *Id.* at 427. But if a term is undefined, it is given the plain and ordinary meaning found in a standard English dictionary. *Id.* at 428.

■■ ¶16 In this case, the face of the memorandum of insurance received by Ms. Rizzuti states as follows:

Now at NO Additional
Cost to You . . .

Automatic
Transportation
Coverage
$100,000

Coverage provided to you
through:
Basin Travel Service—Othello

CP at 248. TII's logo is imprinted on the bottom of the page. On the back, the memorandum of coverage notifies the traveler that he or she is automatically covered for loss of life that occurs "during the trip for which your ticket was issued by the travel agency named on the reverse side (ticketed trip) and premium has been paid." CP at 248. Neither the terms "issued" nor "ticketed trip" are defined in the memorandum of insurance, but it further notifies the traveler that it is merely the "coverage description" summary of the blanket travel policy and is subject to the terms and conditions of the blanket policy. CP at 248. Consequently, Ms. Rizzuti was on notice that she was covered only for tickets issued by Basin for a ticketed trip, subject to the terms and conditions of the blanket policy. Basin also must have paid a premium for that coverage.[3]

¶17 The blanket policy defines a "ticketed trip" as one on a passenger service flight "providing the ticket for such travel has been purchased from, issued by, and reported to

---

[3] The Rizzutis raised a new issue at oral argument. Citing *Safeco Insurance Co. v. Dairyland Mutual Insurance Co.*, 74 Wn.2d 669, 672, 446 P.2d 568 (1968) and RCW 48.18.260, they argued that the memorandum of insurance constituted the entire insurance contract because it was the only document delivered to the insured. We generally will not consider issues raised for the first time in oral argument. *Apostolis v. City of Seattle*, 101 Wn. App. 300, 306, 3 P.3d 198 (2000). Moreover, in *Safeco*, the "loss payee copy" of the insurance contract that was sent to the insured apparently did not specify that it was merely a summary and did not refer to the terms of the blanket policy.

the Air Traffic Conference (ATC) by a Participating Entity." CP at 235. A participating entity is a travel agency that has entered into the insurance agreement. The ATC, now called the Airline Reporting Corporation (ARC), is the governing body and clearinghouse that processes all airplane tickets for the airlines. A travel agency must belong to the ARC in order to sell airline tickets. Basin belongs to the ARC and reports to the ARC all tickets it issues in its office, including the round trip ticket from Pasco to Los Angeles it purchased and issued for Ms. Rizzuti. This ticket identifies Basin as the place of issue and carries Basin's ARC reporting code. A&K purchased the safari trip tickets from the airlines and reported those tickets to the ARC separately. Two of those tickets, one through British Airways and the other through South African Airways, show that the issuing agent was A&K and carry A&K's ARC reporting code.

¶18 Neither the memorandum of insurance nor the blanket policy define "issued." Consequently, we turn to the dictionary, which defines the verb "issue" in part as "to appear or become available through being officially put forth or distributed," "to appear or become available through being brought out for distribution to or sale or circulation among the public," "to go forth by authority," or "to cause to appear or become available by officially putting forth or distributing or granting or proclaiming or promulgating." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1201 (1993). Ms. Kresge explained that only those tickets actually produced on the travel agency's equipment are considered "issued" by the agency. The Rizzutis contend the average person buying insurance would think any airline tickets distributed by a travel agency are "issued" by that agency. However, most of the dictionary definitions suggest a more limited meaning that comports with Ms. Kresge's explanation. This definition involves active, official participation in bringing forth a ticket—something more than mere distribution. A fair and reasonable construction of the term supports TII's limitation of coverage to only those

tickets purchased directly from the airlines by Basin, issued in Basin's office, and reported by Basin to the ARC.[4]

■ ■ ¶19 The Rizzutis contend TII is estopped from arguing that the blanket policy controls here because this policy was not provided to Basin or to Ms. Rizzuti and because TII originally denied coverage on a different basis. Equitable estoppel arises when statements or conduct of a person are inconsistent with the claims that person later asserts, and another person reasonably relies upon the original statements or conduct to his or her detriment. *Shows v. Pemberton*, 73 Wn. App. 107, 868 P.2d 164 (1994). Application of the principles of estoppel is not justified here because the Rizzutis do not show inconsistent claims or injury.

■ ¶20 It is true that the letter from TII denying coverage stated only that the South African Airways tickets were not "purchased" from Basin, but from A&K. CP at 254. The TII claim manager mistakenly applied the language from an outdated memorandum of insurance that referred to covered flight tickets as those purchased through the participating entity. It was also unclear until later that Ms. Rizzuti had not died on the South African Airways flight, but on a chartered flight arranged by A&K on Northern Air. In some cases, an insurer that denies liability under a policy for one reason may be estopped from later raising other previously known grounds in an attempt to escape liability. *Bosko v. Pitts & Still, Inc.*, 75 Wn.2d 856, 864, 454 P.2d 229 (1969). The insured must have been prejudiced by the insurer's failure to raise the other grounds initially. *Id.* The Rizzutis contend they were prejudiced because they might not have incurred the expenses of litigation if they had known TII would later deny coverage on the basis of the term "issued." However, the memorandum of insurance given to Ms. Rizzuti specifically limits coverage to flights

---

[4] The Rizzutis also argue that a trip ticket invoice for the entire trip identifies Ms. Kresge by her ARC number as the agent that issued the invoice. As Ms. Kresge testified, she included her ARC reporting number on all official papers, including invoices, as an identifier. And the invoice obviously is not an airline ticket for the purposes of the policy's coverage.

"issued" by Basin. The insured was informed in the memorandum of insurance that the blanket policy controlled, and was directed to send all claims to TII. The Rizzutis did not comply with that direction. They also presented no evidence that they requested the underlying policy from TII or that TII withheld it. The record does not indicate when the Rizzutis finally obtained a copy of the blanket policy. There is no indication in the record that they would have accepted a different rationale for denying coverage.

¶21 More important, whatever TII stated as the reason for denying coverage, the fact remains that the blanket policy and the memorandum of insurance required covered tickets to be issued by and reported to the ARC by the participating travel agency. Estoppel may not be applied to extend the coverage of an insurance policy. *Shows*, 73 Wn. App. at 111. The rationale for this rule "is that an insurer should not be required to pay for a loss for which it received no premium." *Id.* (citing *Saunders v. Lloyd's of London*, 113 Wn.2d 330, 336, 779 P.2d 249 (1989)). This rule may be inapplicable if the insurer acts in bad faith. *Safeco Ins. Co. of Am. v. Butler*, 118 Wn.2d 383, 393-94, 823 P.2d 499 (1992). However, no estoppel arises if the injured party had an equal opportunity to determine the facts. *Dombrosky v. Farmers Ins. Co. of Wash.*, 84 Wn. App. 245, 256, 928 P.2d 1127 (1996).

¶22 The Rizzutis had a copy of the memorandum of insurance and were on notice of the blanket policy. They were also told from the start by Ms. Kresge that the operative term for coverage in the memorandum of insurance was "issued." Further, as will be discussed later, the Rizzutis cannot show that TII was guilty of bad faith investigation or denial of coverage. Consequently, they may not use principles of estoppel to alter the terms of the automatic transportation policy.

¶23 Because the Rizzutis raise no issue of material fact that supports coverage, the defendants are entitled to summary judgment on this issue as a matter of law. *Id.* at 253.

INSURER BAD FAITH

¶24 The Rizzutis next contend the trial court erred in dismissing their claims of bad faith. They argue that TII violated the standards of insurer good faith found in provisions of Washington statutes and regulations of the Washington Administrative Code (WAC).

■■■■ ¶25 Insurers have a duty of good faith to their policyholders; violations of that duty may give rise to tort actions for bad faith. *Smith v. Safeco Ins. Co.*, 150 Wn.2d 478, 484, 78 P.3d 1274 (2003). "Whether an insurer acted in bad faith is a question of fact." *Id.* However, questions of fact may be determined as a matter of law if reasonable minds could reach but one conclusion. *Id.* at 485. Once the moving party has submitted adequate affidavits to support summary judgment, the burden shifts to the nonmoving party to set forth specific facts that rebut the moving party's contentions and that reveal a material issue of fact. *Dombrosky*, 84 Wn. App. at 253. The nonmoving party may not rely on speculation, argumentative assertions, or unsupported affidavits. *Id.* Consequently, the question before this court is whether the Rizzutis have established a material issue of fact sufficient to defeat the trial court's determination as a matter of law that TII did not breach its duty of good faith to the Rizzutis. *Smith*, 150 Wn.2d at 486.

■■■ ¶26 "The tort of bad faith has been defined as a breach of the obligation to deal fairly with an insured, giving equal consideration to the insured's interests." *Anderson v. State Farm Mut. Ins. Co.*, 101 Wn. App. 323, 329, 2 P.3d 1029 (2000). The duty to act in good faith is broad "and may be breached by conduct short of intentional bad faith or fraud, although not by a good faith mistake." *Id.* (citations omitted). RCW 48.30.010(1) prohibits any person engaged in insurance from using unfair or deceptive acts in the conduct of such business. The statute authorizes the insurance commissioner to promulgate regulations that define minimum standards for insurance business practices. RCW 48.30.010(2); WAC 284-30-300. WAC 284-30-300

through -800 provide these standards and further provide that a violation of the standards constitutes a breach of the insurer's duty of good faith. *Am. Mfrs. Mut. Ins. Co. v. Osborn*, 104 Wn. App. 686, 697, 17 P.3d 1229 (2001).

¶27 WAC 284-30-330 defines specific unfair claims settlement practices. The Rizzutis claim four general acts of bad faith: (1) denial of coverage without reasonable justification (WAC 284-30-330(6), (7), (13)); (2) denial of coverage based on the wrong memorandum of insurance and failure to notify the Rizzutis of this mistake (RCW 48.30.090; WAC 284-30-330(1), -350); (3) denial of coverage without a reasonable investigation (WAC 284-30-330(3), (4), -370); and (4) failure to timely respond to the Rizzutis (WAC 284-30-330(2), -360). They contend TII's unreasonable conduct proximately caused them injury, including the expenses of hiring an insurance expert and commencing the lawsuit.

■ ¶28 I. Denial of coverage. The Rizzutis contend TII violated the following three provisions of WAC 284-30-330:

(6) Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear. In particular, this includes an obligation to effectuate prompt payment of property damage claims to innocent third parties in clear liability situations. . . .

(7) Compelling insureds to institute or submit to litigation, arbitration, or appraisal to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in such actions or proceedings.

. . . .

(13) Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

To prevail on a claim of bad faith denial of coverage, the insured must come forward with evidence that the insurer acted unreasonably. *Smith*, 150 Wn.2d at 486. If the insurer presents a reasonable basis for its action, the insured may raise a question of material fact by presenting evidence that

the insurer's alleged basis was not the actual basis for denying coverage. *Id.* As discussed above, TII presented sufficient facts to support the reasonableness of its decision to deny coverage. The memorandum of insurance and the blanket policy clearly state that the automatic transportation policy covered only tickets issued and reported to the ARC by Basin. The Rizzutis received notice of these provisions from Ms. Kresge even before TII had been notified of their claim. They do not provide evidence sufficient to raise an issue of material fact regarding the reasons for or the reasonableness of TII's denial of coverage. The promptness of TII's notice to the Rizzutis is discussed below.

¶29 II. Misrepresentation of the policy provisions. The Rizzutis contend TII misrepresented the policy by initially denying coverage based on language found in an outdated memorandum of insurance. Specifically, they allege violations of RCW 48.30.090 (prohibiting the issue or circulation of "any misrepresentation of the terms of any policy or the benefits or advantages promised thereby"), WAC 284-30--330(1) (defining the misrepresentation of pertinent facts or policy provisions as an unfair or deceptive act), and -350 (prohibiting an insurer or agent from failing to disclose to claimants all pertinent benefits or coverage).

¶30 Denial of coverage based on a mistaken assumption of the insurer is not in bad faith unless the denial is both frivolous and unfounded. *Ins. Co. of the State of Pa. v. Highlands Ins. Co.*, 59 Wn. App. 782, 786-87, 801 P.2d 284 (1990). TII mistakenly believed Basin had given Ms. Rizzuti the old memorandum of insurance. Although the new memorandum stressed that covered tickets must have been *issued* by Basin, the old memoradum's provision that the tickets must have been *purchased* by Basin is not actually incorrect. According to the blanket policy, a covered "ticketed trip" requires a ticket "purchased from, issued by, and reported to" the ARC by the participating entity. CP at 235.

¶31 Here, the record shows that the African tickets were actually purchased by A&K from funds forwarded to A&K from Basin or received directly from Ms. Rizzuti's American

Express account. Consequently, the Rizzutis fail to present evidence that TII misrepresented the policy in its initial denial of coverage or that TII's mistake in relying on the outdated memorandum of insurance was unfounded or frivolous.

¶32 III. Failure to make a reasonable investigation. The Rizzutis contend TII denied coverage without conducting a reasonable investigation into the facts. They present evidence that TII did nothing more than look at the ticket receipts for flights other than the fatal flight. The relevant regulations include WAC 284-30-330(3) (adoption and implementation of reasonable standards of prompt investigation of claims), -330(4) (conducting a reasonable investigation before refusing to pay claims), and -360 (timelines for responding to claims).

¶33 An insurer must make a good faith investigation of the facts before denying coverage and may not deny coverage based on a defense that reasonable investigation would have proved to be without merit. *Indus. Indem. Co. of the N.W., Inc. v. Kallevig*, 114 Wn.2d 907, 917, 792 P.2d 520 (1990). Because an insurer's duty of good faith is separate from its duty to indemnify, an insured may maintain an action for bad faith investigation of the claim even if the insurer was ultimately correct in denying coverage. *Coventry Assocs. v. Am. States Ins. Co.*, 136 Wn.2d 269, 279, 961 P.2d 933 (1998).

¶34 In *Kallevig*, the insurer denied coverage based on a defense that was rebutted by evidence presented by the insured. Finding sufficient evidence that a reasonable investigation by the insurer would have revealed the error, the court affirmed the jury's verdict of bad faith investigation. *Kallevig*, 114 Wn.2d at 918-19. Here, TII's investigation was not unreasonable under the circumstances. Unlike in *Kallevig*, where a mysterious restaurant fire raised allegations of arson, the issues to be determined for coverage here were not complicated. As Mr. Novotny testified, the typical investigation of claims on the automatic transportation policy involves three questions: (1) did the travel

agency purchase coverage for the tickets it issued, (2) did the death or loss occur during the period of coverage, and (3) does the ticket stub establish that the ticket was issued by the travel agency and reported to the ARC? If all three answers are yes, then TII pays the claim.

¶35 Here, TII established that Basin had purchased coverage for the tickets it issued and that Ms. Rizzuti died during the coverage period. However, ticket stubs for the Livingstone Safari showed that A&K issued and reported the African tickets to the ARC. Although there is no ticket stub for the fatal Northern Air flight (because it was chartered), TII reasonably assumed that because A&K arranged all of the African flights, Basin did not issue the ticket for the fatal flight and did not report it to the ARC. Ms. Kresge confirmed that fact to the Rizzutis. TII mistakenly assumed Ms. Rizzuti died on the South African Airways flight. However, this assumption did not alter the fact that none of the African flights were issued by Basin or reported by Basin to the ARC. Ultimately, the Rizzutis cannot defeat a determination as a matter of law that TII did not deny coverage without a reasonable investigation.

¶36 IV. Delay in responding to the Rizzutis. WAC 284-30-370 requires every insurer to "complete investigation of a claim within thirty days after notification of claim, unless such investigation cannot reasonably be completed within such time. All persons involved in the investigation of a claim shall provide reasonable assistance to the insurer in order to facilitate compliance with this provision." The Rizzutis contend TII received notice of claim on May 1, 2000, when Mr. Hines sent a letter to Ms. Kresge asking about the automatic transportation coverage. But Ms. Kresge was not the insurer and was not an agent of the insurer. She was a party to the contract of insurance.

¶37 If an entity that provides insurance for others assumes responsibility for administration of the plan, a question of fact may arise as to the agency relationship between the insurer and the entity. *See McCann v. Wash. Pub. Power Supply Sys.*, 60 Wn. App. 353, 361, 803 P.2d 334

(1991) (regarding an employer who provides group insurance for employees). Here, however, Basin assumed no responsibility for administration of the automatic transportation coverage. Ms. Kresge's entire involvement up until she received notice of the Rizzutis' claim was to enclose the memorandum of insurance with tickets issued in her office and to pay the premiums for those tickets. Notice to her of a claim was not notice to TII. In her capacity as a party to the insurance policy, she advised Mr. Hines that Ms. Rizzuti was not covered under the automatic travel policy. She gave a copy of Ms. Rizzuti's travel file to Sueanne Rizzuti and also sent a copy of the memorandum of insurance to Mr. Hines. Although Mr. Hines had notice from the memorandum that all claims must be sent to TII's address, he never complied with that requirement. It was only after Ms. Kresge sent Mr. Hines's letter to TII some time after October 17, 2000 that TII received notice that the Rizzutis were seeking to claim on the policy.

¶38 Although it is unclear when TII received notice, it is reasonable to assume from TII's January 24, 2001 letter denying coverage that investigation of the claim was completed beyond the 30-day period prescribed by WAC 284-30-370. As with other bases for a claim of bad faith, however, delay does not constitute bad faith unless it is due to a frivolous and unfounded reason. *Highlands*, 59 Wn. App. at 786-87. Considering that the Rizzutis did not make an actual notice of claim to TII as directed in the memorandum of insurance, the Rizzutis failed to establish as a question of fact whether TII's investigation and resolution of the claim were delayed for a frivolous and unfounded reason. *Id.* at 789. *See* WAC 284-30-320(7) (notification of claim means any notification acceptable under the terms of the insurance contract to an insurer or its agent by a claimant).

¶39 In summary, the Rizzutis fail to raise a material issue of fact regarding TII's alleged bad faith processing or investigation of the claim. Additionally, they fail to establish with specific evidence that they were harmed by

TII's alleged bad faith acts. *Coventry*, 136 Wn.2d at 276. Although they contend TII's bad faith denial of coverage and failure to promptly investigate and respond forced them to hire an insurance expert and to commence this lawsuit, the evidence does not support this contention. This court will not accept at face value argumentative assertions or unsupported affidavits of the nonmoving party. *Dombrosky v. Farmers Ins. Co. of Wash.*, 84 Wn. App. 245, 253, 928 P.2d 1127 (1996). The Rizzutis do not specify who was hired as an insurance expert or why such an expert was necessary under these circumstances. The record also shows that these expenses were incurred only after TII reasonably denied recovery, not due to an act of bad faith. TII's evidence that it acted reasonably and in good faith and the Rizzutis' failure to establish evidence of injury caused by acts of bad faith support the trial court's conclusion as a matter of law that the bad faith claim was properly dismissed on summary judgment.

CONSUMER PROTECTION ACT

█  █ ¶40 Citing the unfair practices prohibited by WAC 284-30-330 through -370, the Rizzutis also alleged violation of the CPA. The CPA provides that unfair or deceptive acts in the conduct of trade or commerce are unlawful. RCW 19.86.020. To prevail on a CPA claim, the claimant must provide evidence of (1) an unfair or deceptive act or practice in trade or commerce that impacts public interest and (2) resulting injury to the claimant's business or property. *James E. Torina Fine Homes, Inc. v. Mut. of Enumclaw Ins. Co.*, 118 Wn. App. 12, 20, 74 P.3d 648 (2003), *review denied*, 151 Wn.2d 1010 (2004). Any act that qualifies as an unfair claims settlement practice in WAC 284-30-330 constitutes a per se unfair trade practice impacting public interest. *Id.* at 20-21 (citing *Kallevig*, 114 Wn.2d at 923). "The question of whether an act or practice is actionable under the Consumer Protection Act is a question of law." *Dombrosky*, 84 Wn. App. at 260; *see*

*also Leingang v. Pierce County Med. Bureau, Inc.,* 131 Wn.2d 133, 150, 930 P.2d 288 (1997).

¶41 As discussed above, the Rizzutis did not carry their burden of showing violations of WAC 284-30-330 through -370. Consequently, they did not establish unfair or deceptive trade practices in the investigation of and timely response to their claim. Further, a reasonable basis for denying coverage constitutes a complete defense to any claim that the insurer denied coverage in bad faith or in violation of the CPA. *Dombrosky,* 84 Wn. App. at 260. The trial court properly dismissed the CPA claim on summary judgment.

¶42 Affirmed.

KURTZ and BROWN, JJ., concur.