IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | |
|---|---|
| THELMA, KARL, LORI, and KARIN KLOSTER, | No. 30546-5-III |
| Appellants, | |
| v. | |
| SCHENECTADY ROBERTS, PACIFIC RIM BROKERS, INC., a corporation, AMERI-TITLE, INC., a corporation, and DOES ONE through FIFTY, inclusive, | UNPUBLISHED OPINION |
| Respondents, | |
| FIRST AMERICAN TITLE INSURANCE COMPANY, a corporation, | |
| Respondent and Cross Appellant. | |
| MICHAEL MOORE, | |
| Defendant. | |

FEARING, J. — Karl and Thelma Kloster, and Karl's parents, Lori and Karin

Kloster (Klosters) bought a vacant lot (Lot 1) in rural Klickitat County thinking they held

an access easement over property bordering to the south. The easement, however, was

not signed by the grantor, and the parties to this suit assume the easement does not bind

the neighboring property. When the neighboring property owner blocked use of the

easement, the Klosters, despite having an alternate access route, filed suit for

misrepresentation, against their seller of Lot 1, the real estate broker, their title company, and the title company's local agent. They sought additional damages from the title company and its agent and underwriter for breach of the insurance contract, breach of the duty to defend and indemnify, bad faith, and violation of the Consumer Protection Act (CPA) chapter 19.86 RCW. The title company counterclaimed for a declaratory judgment that its policy provided no coverage. After a series of summary judgment dismissals of some defendants and a jury trial on the remaining claims, judgment was entered for all defendants except the title company, which was ordered to pay the cost to cure the lack of an easement and some of the Klosters' attorney fees related to the title insurance coverage issue.

The Klosters appeal most of the trial court rulings. Among other assignments of error, the Klosters contend the trial court erred (1) in dismissing their claim, on summary judgment, against the seller of the property; (2) in denying their motion to include the developer in his individual capacity as a necessary party; (3) in dismissing the broker as successor in interest of the developer; (4) in concluding that the title company's agent was not a coinsurer of their title; (5) in ruling that there was insufficient evidence that the agent was negligent; (6) in concluding that the title company did not breach the title policy, the unfair claims settlement practices regulations, or the CPA; (7) in dismissing the Klosters' claims for noneconomic damages and all economic damages except "cost of cure"; (8) in awarding the broker and the seller attorney fees; and (9) in denying the

2

Klosters' full claim for attorney fees from the title company. The title company cross appeals, contending the trial court erred (1) in ruling that the Klosters had coverage under the title policy for a purported access easement, (2) in allocating $9,000 against the title company as a cost of cure, and (3) in awarding attorney fees to the Klosters.

In a marathon opinion necessitated by the many issues raised on appeal, we affirm the trial court's rulings in favor of the seller, real estate broker, and developer principally on the ground that no representation was given to the Klosters concerning an access easement. We reverse the judgment entered against the title company on the ground that its policy did not cover the loss.

## FACTS

Since the trial court dismissed some of the Klosters' claims on summary judgment and the jury ruled on other claims of the Klosters, this outline of facts contains, where respectively appropriate, testimony from summary judgment affidavits and from trial.

In 1978, Alvin (Fred) Heany created short plat WS-146 on a 23-acre parcel he owned in Klickitat County.[1] The short plat consisted of four tracts, each subject to easements and use reservations. Tract 1, north of Tract 2, was divided into Lots 1 and 2. In addition to owning the land, Heany was a real estate broker, who operated under the name of Pacific Rim Properties (Pacific Rim), a sole proprietorship.

---

[1] A copy of the short plat is appended to the opinion.

3

In 1979, Fred Heany filed an application for a long plat subdivision called Pacific Rim Estates, which included land found within short plat WS-146. The map attached to the long plat application showed a 30-foot wide access easement along the northern border of Tract 2 for the benefit of the owners of Lots 1 and 2, Tract 1, as well as a 30-foot wide easement along the southern border of Lots 1 and 2 for the benefit of Tract 2. The 30-foot wide easement across the southern border of Lot 2 also benefited Lot 1. A 60-foot width is required by Klickitat County for a public right-of-way.

Klickitat County insisted, for a long plat, that all property owners affected by rights-of-way sign the plat and join in the dedication of their property for roads. In 1981, pending final approval of the long plat application, Heany sold, on contract, Tract 2 to Michael Fester, subject to "[t]hose easements and reservations of record" on the short plat. Ex. 52. Fester agreed with Heany to permit an access easement across the northern 30-feet of Tract 2.

In November 1981, owners of property within the Pacific Rim subdivision signed the long plat application, which included a dedication of access easements. The owner of Lot 2, Tract 1, signed the application acknowledging his dedication of an easement along his southern border for the benefit of Lot 1 and other land. Robert Blades, a real estate salesperson for Pacific Rim, notarized the signatures, including Fred Heany's signature. The signature of Michael Fester, owner of Tract 2, however, was inadvertently omitted.

4

Klickitat County approved the long plat application and Heany recorded the plat in December 1981 without Fester's signature.

In 1982, Fred Heany and Robert Blades incorporated Pacific Rim Properties as Pacific Rim Brokers, Inc. (PRB). Heany transferred his ownership interest in PRB to Blades one year later.

Fred Heany's fulfillment deed to Michael Fester, for Tract 2, was recorded in 1983 without mention of the long plat or the easement across the northern boundary of the land. Fester sold Tract 2 to Larry and Rhonda Rickey in 2000. The map attached to the Rickeys' title insurance policy did not show an easement encumbering the northern 30 feet of their land. The Rickeys constructed and used a road, along their northern boundary, as a driveway.

Defendant Schenectady Roberts inherited Lots 1 and 2, Tract 1, from her father, who purchased the lots from Fred Heany. In 2005, Roberts sold, for $38,000, Lot 1 to the Klosters. Karl and Thelma Kloster had previously bought and sold multiple properties. PRB served as listing agent for the sale of Lot 1. Adrian Palmer, an agent of PRB, acted as buying agent of the Klosters.

At the time of the sale and during the events leading to the sale, Roberts resided in California. She had no direct contact with the Klosters. Roberts had no knowledge of any easements or the lack of easements, nor was she aware of any representations made by PRB.

PRB agent Adrian Palmer showed the land to Thelma and Karl Kloster. During the showing, according to deposition testimony of Palmer, he "shared his feelings with both Karl and Thelma that there was an easement." Palmer provided to Karl Kloster a copy of the plat map that showed a 30-foot access easement along the northern edge of Tract 2, and Palmer represented to Karl Kloster that the plat map was accurate.

During the showing, the Klosters and Adrian Palmer noticed a barbed wire fence along the boundary of Tract 2 and Lot 1 that blocked access to the easement on the north end of Tract 2. Palmer still believed an easement existed across the northern part of Tract 2 and extended across the fence line, but he stated to the Klosters that the fence might be a problem. The Klosters were then still contemplating whether to purchase the property. The Klosters never thereafter asked Palmer about the fence.

Adrian Palmer shared his concern about the barbed wire fence with PRB's Robert Blades. Blades told Palmer that he would contact the Rickeys. Blades left the Rickeys a telephone message, but never spoke with them. Palmer did not tell the Klosters of his conversation with Blades.

As part of the sale, Schenectady Roberts and the Klosters signed, in January 2005, a Vacant Land Purchase and Sale Agreement (VLPSA). The agreement provided for attorney fees and costs to the prevailing party "[i]f the Buyer, Seller, or any real estate licensee or broker involved in this transaction is involved in any dispute relating to this transaction." Clerk's Papers (CP) at 3744. The VLPSA also read that "[a]ll terms of this

6

Agreement, which are not satisfied or waived prior to closing, shall survive closing.

These terms shall include, but not be limited to, representations and warranties, attorneys

fees and costs, . . . etc." CP at 3745.

Defendant Ameri-Title, Inc., serving as First American Title Insurance Company's

agent, conducted a title search for Lot 1 and issued a preliminary commitment for title

insurance. The preliminary title commitment included an appended partial plat map. The

map showed a 30-foot access easement along the northern border of Tract 2 and 30-foot

access easements along the southern borders of Lots 1 and 2. As may be surmised,

neither Michael Fester nor his successors in interest, the Rickeys, signed a document

agreeing to the easement across Tract 2, and the lack of written approval gives rise to this

suit. Also, if the Klosters deemed the 30-wide easement across the southern end of Lot 2,

Tract 1, to be sufficient, this suit may not have ensued, despite the lack of an easement

across the northern boundary of Tract 2.

Printed across the top of the map attached to the commitment was a disclaimer:

ANY SKETCH ATTACHED HERETO IS DONE SO AS A COURTESY
ONLY AND IS NOT PART OF ANY TITLE COMMITMENT OR
POLICY. IT IS FURNISHED SOLELY FOR THE PURPOSE OF
ASSISTING IN LOCATING THE PREMISES AND FIRST AMERICAN
EXPRESSLY DISCLAIMS ANY LIABILITY WHICH MAY RESULT
FROM RELIANCE MADE UPON IT.

Ex. 94, at 34. At trial, Karl Kloster testified, "I know the difference between a sketch and

a short plat map, and I know that is a sketch. That's provided as a courtesy to locate the

7

property, and that's it." Report of Proceedings (RP) at 1074. Mr. Kloster was asked if he relied on the short plat sketch attached to his title policy as a representation of what was covered in the policy. He explained that he did not rely on the sketch of the plat because it had a disclaimer at the top.

The agency contract between Ameri-Title and First American Title provided that Ameri-Title was responsible for the first $3,500 of any loss on any First American policy issued by Ameri-Title. Ameri-Title was instructed by First American to verify whether access easements are properly created for any property on which title insurance was requested, and if they were not, to so note in the preliminary commitment and in the title policy by use of a special exception. Ameri-Title did not determine whether access easements were properly created for Lot 1 and did not note in the preliminary commitment or in the title policy issued to the Klosters that the purported access easement across Tract 2 was defective.

The First American Title insurance policy provided coverage for loss due to a lack of a right of access to Lot 1, but did not provide coverage for any specific easement. The policy language read, in part:

> FIRST AMERICAN TITLE INSURANCE COMPANY . . . insures . . .
> against loss or damage, not exceeding the Amount of Insurance stated in
> Schedule A, sustained or incurred by the insured by reason of:
> . . . .
> 4. Lack of a right of access to and from the land.
> The Company will also pay the costs, attorneys' fees and expenses
> incurred in defense of the title, as insured, but only to the extent provided

in the Conditions and Stipulations.

Ex. 95. Schedule A identified only Lot 1. The amount of insurance was $38,000.

Schedule B of the title policy listed exclusions from coverage, including this

general exception: "Easements, claims of easement or encumbrances which are not

shown by the public records." Ex. 95, at 5. Specific exceptions related to the unrecorded

easement on the northern 30 feet of Tract 2 are:

> 5. Easements, Conditions, Restrictions and Reservations, including
> the terms and provisions thereof, as contained in Short Subdivision
> filed as Auditor's File No. 167997, Klickitat County Short Plat Records.
> . . . .
> 8. Conditions, Restrictions, Easements for roadways and Utilities and
> disclosure regarding maintenance of roads, including the terms and
> provisions thereof, as shown on the Plat recorded December 1, 1981 in
> Book 5, Pages 31 and 32, Klickitat County Plat Records.

Ex. 95, at 6. The plat sketch attached to the title policy is a portion of the short plat map

in Auditor's File No. 167997. Exclusion 8 refers to easements for roadways as shown on

the plat in Book 5, pages 31 and 32, of the county records, which is the same plat referred

to in Schedule A's description of the property.

Under Section 4 in the title insurance policy, First American agreed to defend

against third party claims adverse to the title as follows:

> Upon written request by the insured . . . , the Company, at its
> own cost and without unreasonable delay, shall provide for the defense
> of an insured in litigation in which any third party asserts a claim adverse
> to the title or interest as insured, but only as to those stated causes of
> action alleging a defect, lien or encumbrance or other matter insured
> against by this policy . . . . The Company will not pay any fees, costs

or expenses incurred by the insured in the defense of those causes of action which allege matters not insured against by this policy.

Ex. 95.

When the Klosters began using the Rickeys' driveway to drive to Lot 1, the Rickeys blocked access over Tract 2 and reported the Klosters for trespass. Karl Kloster conceded that he could build an access road to his property across land not found in Tract 2. Nevertheless, he would not have bought the property if he knew he needed to build the road in an alternate location, because the terrain would render the road costly. Karl Kloster, who has experience in building roads, testified the costs could approach $20,000.

The Klosters complained to Ameri-Title about the missing easement and Ameri-Title recommended that the Klosters consult an attorney. On March 25, 2005, the Klosters submitted a claim to title insurer, First American Title. The Klosters made a demand upon Ameri-Title and First American to defend their interest in the unrecorded easement across Tract 2 from the adverse claims of the Rickeys, who were also insured by First American.

First American began its investigation immediately. On its initial claim report, First American wrote that the Klosters allege an "irregularity/omission-agent." Ex. 107. The description referenced an attached letter from the Rickeys' attorney describing the conflicting maps shown on the Klosters' and the Rickeys' title policies. The employee

10

who prepared the initial claim report testified that the appellation "irregularity/omission" best fit the situation. She explained that the only choices she had for describing the claim were "error omission by employee, error omission by agent, or company practice risk," and it appeared the Klosters were claiming that an agent was responsible. RP at 758.

On March 31, 2005, First American Title sent a letter to the Klosters' attorney, announcing its decision to deny the claim. In the letter, First American explained that the legal description of the insured property did not include appurtenant easements. The company wrote that the policy covered loss by reason of a lack of a right of access, but the Klosters had a right of access over the south 30 feet of Lot 2, and the policy did not cover an easement over Tract 2.

The Klosters filed suit in April 2005. The complaint caption included a listing of defendants "DOES ONE through FIFTY." CP at 1. On September 10, 2007, more than two years after filing of the complaint, the Klosters served a summons and complaint on Fred Heany as "Doe One." CP at 1056, 1059. Heany moved to quash the summons, asserting that he was known by name and capacity by the Klosters even before the suit was filed, that it was therefore inappropriate to consider him a recently discovered party, and that the Klosters had not properly moved to amend the complaint, citing CR 4(h), CR 10(a)(2), and CR 15. The summons was quashed in April 2008. Thereafter the Klosters moved pursuant to CR 10(a)(2), CR 15(c), and CR 21 to substitute Fred Heany as Defendant Doe One. The trial court also denied this motion.

11

During the pendency of suit, the parties filed multiple motions, including motions for summary judgment and for limitation of damages. The trial court dismissed Michael Moore, the agent of Ameri-Title, with prejudice, dismissed the claims against seller Schenectady Roberts on summary judgment, and dismissed the claims against Ameri-Title as a matter of law under CR 50(a). Finding that the map appended to the preliminary commitment and the final title insurance policy created an ambiguity concerning coverage of the apparent easement over Tract 2, the trial court concluded as a matter of law that the title insurance policy covered the unrecorded easement.

The jury trial began October 31, 2011. After conclusion of the Klosters' case, the trial court dismissed the claims against PRB and First American for fraudulent misrepresentation, fraudulent concealment, and bad faith. The court also concluded as a matter of law that PRB did not have successor liability for Fred Heany's actions as developer of Pacific Rim Estates. First American and PRB rested without presenting additional testimony.

The jury concluded that PRB was not liable for negligent misrepresentation, that the Klosters failed to minimize their loss, and that the Klosters were 100 percent at fault. The jury also found, however, that the cost to cure the defect was $9,000. The trial court entered judgment against First American for the $9,000 "cost of cure." The trial court entered an additional judgment against First American for the Klosters' presettlement offer of attorney fees and costs related to their insurance coverage claims, offset by First

12

American's costs incurred after the settlement offer expired, pursuant to CR 68, for a total of $33,715.35. The Klosters were ordered to pay Roberts and PRB $269,918.08 in attorney fees and costs.

ROBERTS LIABILITY

In their complaint, the Klosters alleged that Schenectady Roberts affirmatively represented, through her real estate agent PRB, that the acreage was suitable for residential development and without impairment of access easements. In the alternative, the Klosters allege that Roberts held an obligation to affirmatively disclose the existence of the "defective" access easement. CP at 9. In support of the allegations and in opposition to summary judgment motions, Thelma Kloster and Karl Kloster filed nearly identical affidavits stating that real estate agents at PRB never warned her or him of any defect in an access easement. The plat map that Adrian Palmer gave to Karl Kloster, when walking the property, is attached to the Klosters' counsel's affidavit. The plat showed an access easement across the north 30 feet of Tract 2.

The Klosters sued Schenectady Roberts for negligent and intentional misrepresentation and fraudulent concealment, three species of misrepresentation. In response to a summary judgment motion, the Klosters added a claim of innocent misrepresentation, another species of misrepresentation. Claims of misrepresentation are no longer barred by the rejected economic loss rule, but permitted by the independent duty doctrine. *Austin v. Ettl*, 171 Wn. App. 82, 87 n.6, 286 P.3d 85 (2012). Because the

13

duty to refrain from fraud is independent of the contract, the independent duty doctrine permits a party to pursue a fraud claim even if a contract exists. *Jackowski v. Borchelt*, 174 Wn.2d 720, 738, 278 P.3d 1100 (2012). A party's misrepresentation renders a contract defective, such that tort remedies are appropriate. *Austin*, 171 Wn. App. at 87 n.6.

The trial court dismissed all claims against Roberts on summary judgment, because facts submitted by the Klosters could not sustain any claim of misrepresentation. We review the trial court's grant of summary judgment de novo, viewing the facts and inferences in the light most favorable to the nonmoving party. *Jackowski*, 174 Wn.2d at 729. Summary judgment is appropriate if there is no genuine issue regarding a material fact and if the moving party is entitled to judgment as a matter of law. *Id.*; CR 56(c).

*Innocent misrepresentation.* The elements of innocent misrepresentation are innocent misrepresentation of a material fact for the purpose of inducing the other to rely on the misrepresentation, and pecuniary loss caused by justifiable response on the misrepresentation. *Hoffman v. Connall*, 108 Wn.2d 69, 72-73, 736 P.2d 242 (1987) (quoting RESTATEMENT (SECOND) OF TORTS § 552C(1) (1977)). The Klosters fail to present a factual issue on this claim, because they forward no evidence that Roberts supplied false information, a defect in most of the Klosters' misrepresentation claims. Schenectady Roberts' assertion that she never communicated with the Klosters or knew

14

of any purported easement across Tract 2 is unrebutted and conforms to the Klosters'
version of the facts.

*Negligent misrepresentation.* To establish negligent misrepresentation, a plaintiff
must "prove by clear, cogent, and convincing evidence that (1) the defendant supplied
information for the guidance of others in their business transactions that was false, (2) the
defendant knew or should have known that the information was supplied to guide the
plaintiff in his business transactions, (3) the defendant was negligent in obtaining or
communicating the false information, (4) the plaintiff relied on the false information, (5)
the plaintiff's reliance was reasonable, and (6) the false information proximately caused
the plaintiff damages." *Ross v. Kirner*, 162 Wn.2d 493, 499, 172 P.3d 701 (2007);
*Austin*, 171 Wn. App. at 88. Moreover, "[a]n omission alone cannot constitute negligent
misrepresentation, since the plaintiff must justifiably rely on a misrepresentation." *Ross*,
162 Wn.2d at 499. Since negligent misrepresentation carries a higher burden for the
plaintiff than a claim of innocent misrepresentation, it follows that, if the Klosters' claim
of innocent misrepresentation cannot survive a summary judgment motion, the claim of
negligent misrepresentation also loses.

*Intentional (fraudulent) misrepresentation.* Intentional misrepresentation or fraud
carries an even higher burden for the plaintiff. "A plaintiff claiming fraud must prove
each of the following nine elements: '(1) representation of an existing fact, (2)
materiality, (3) falsity, (4) the speaker's knowledge of its falsity, (5) intent of the speaker

15

that it should be acted upon by the plaintiff, (6) plaintiff's ignorance of its falsity, (7) plaintiff's reliance on the truth of the representation, (8) plaintiff's right to rely upon it, and (9) damages suffered by the plaintiff.'" *Stieneke v. Russi*, 145 Wn. App. 544, 563, 190 P.3d 60 (2008) (quoting *Stiley v. Block*, 130 Wn.2d 486, 505, 925 P.2d 194 (1996)). As with their claim of negligent misrepresentation, the Klosters fail to show that Roberts made any representations at all or that she participated in or authorized any misrepresentations of material fact to the Klosters.

*Fraudulent concealment.* Fraudulent concealment, another species of fraud, is sometimes considered a form of negligent misrepresentation. *See Van Dinter v. Orr*, 157 Wn.2d 329, 333, 138 P.3d 608 (2006). On a claim for fraudulent concealment, "the seller's duty to speak arises[:] where (1) the residential dwelling has a concealed defect; (2) the vendor has knowledge of the defect; (3) the defect presents a danger to the property, health, or life of the purchaser; (4) the defect is unknown to the purchaser; and (5) the defect would not be disclosed by a careful, reasonable inspection by the purchaser." *Stieneke*, 145 Wn. App. at 560. Failure to disclose a material fact when there is a duty to disclose is fraudulent. *Id.* A duty to disclose in a business transaction typically arises under a fiduciary relationship. *Austin*, 171 Wn. App. at 90. The duty may also arise, however, "when the facts are peculiarly within the knowledge of one person and could not be readily obtained by the other," or when the seller takes advantage

16

of the buyer's lack of business experience by remaining silent. *Van Dinter*, 157 Wn.2d at 334.

The Klosters provide no evidence that Schenectady Roberts knew that the easement depicted on the short plat map was invalid, that the unrecorded easement presented some kind of danger, or that the Klosters could not have discovered that the easement was unrecorded with an inspection of the county records. Roberts had no special relationship of trust or confidence with the Klosters and had less experience with real estate transactions than the Klosters. Summary dismissal of this claim was also appropriate.

*Vicarious liability for real estate agent's representations.* The Klosters contend Adrian Palmer, a PRB agent, told them that the easement on Tract 2 served Lot 1, and that Roberts, as principal, is vicariously liable for PRB's false representation. A principal is not liable, however, for any act, error, or omission by her real estate agent unless the principal participated in or authorized the act, error, or omission. RCW 18.86.090. Thus, PRB's statements may not be attributed to Roberts unless the Klosters could show that Roberts participated in or authorized those representations. The Klosters made no such showing. Their failure to raise a factual issue on this essential element supports dismissal of this claim on summary judgment. *White v. Kent Med. Ctr., Inc.*, 61 Wn. App. 163, 170, 810 P.2d 4 (1991). The nonmoving party's failure to provide evidence to support an essential element of that party's case renders all other facts immaterial. *Miller v. Likins*, 109 Wn. App. 140, 145, 34 P.3d 835 (2001).

17

*Warranty of clear title.* Finally, the Klosters contend Roberts is liable under the statutory warranty deed given to the Klosters. Statutory warranty deeds are governed by RCW 64.04.030. *Edmonson v. Popchoi*, 172 Wn.2d 272, 278, 256 P.3d 1223 (2011). A warranty deed covenants against both known and unknown title defects. *Mastro v. Kumakichi Corp.*, 90 Wn. App. 157, 162, 951 P.2d 817 (1998); *see Foley v. Smith*, 14 Wn. App. 285, 292, 539 P.2d 874 (1975). Under RCW 64.04.030, a grantor conveying land by statutory warranty deed makes five covenants against title defects:

> "(1) that the grantor was seised of an estate in fee simple (warranty of seisin); (2) that he had a good right to convey that estate (warranty of right to convey); (3) that title was free of encumbrances (warranty against encumbrances); (4) that the grantee, his heirs and assigns, will have quiet possession (warranty of quiet possession); and (5) that the grantor will defend the grantee's title (warranty to defend)."

*Mastro*, 90 Wn. App. at 162 (quoting 17 WILLIAM B. STOEBUCK, WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW § 7.2, at 447 (1995)).

The Klosters contend the trial court found that the title was defective due to the unrecorded access easement. On the contrary, the trial court ruled on more than one occasion that, as a matter of law, the Klosters have legal and physical access to Lot 1. The court refused to rule that the unrecorded easement was a defect on the title.

After trial, the court entered findings of fact and conclusions of law to support the awards of attorney fees. The Klosters seize upon one of these findings, which states, "The '"cost of cure"' is a covered loss under FIRST AMERICAN's title policy issued to

18

the KLOSTERS because the title policy is a contract of indemnity which insures against actual loss from the existence of a title defect." CP at 4452. As will be discussed below, this finding is erroneous. More importantly, the finding was not entered in the context of any claim against Schenectady Roberts.

At any rate, the Klosters' title in Lot 1 is unencumbered. Generally, an easement is an encumbrance on the *servient* property, and the failure to disclose an easement on the servient property breaches the warranty of clear title. *See Hebb v. Severson*, 32 Wn.2d 159, 167, 201 P.2d 156 (1948). But the Klosters claim the opposite—that their seller of the dominant property failed to pass title to an easement on the adjoining servient land. No case or statute demands that the warranty of clear title extend to an interest off the sold land.

No other party has a recorded ownership interest in Lot 1. Accordingly, no defects or encumbrances affect the Klosters' legally recognized rights in their property. *See Dave Robbins Constr., LLC v. First Am. Title Co.*, 158 Wn. App. 895, 902, 249 P.3d 625 (2010). The trial court did not err in concluding as a matter of law that Ms. Roberts is not liable under the statutory warranty deed.

## JOINDER OF DEVELOPER HEANY

More than two years after filing of the complaint, the Klosters served a summons and complaint on Fred Heany as "Doe One." CP at 1059. The summons was quashed in April 2008, since Heany had not been joined as a defendant. Thereafter the Klosters

19

moved pursuant to CR 10(a)(2), CR 15(c), and CR 21 to substitute Fred Heany as Defendant Doe One. The trial court also denied this motion. From these rulings, the Klosters appeal.

*Service on Heany.* Under CR 10(a)(2), if a plaintiff does not know the name of a defendant, the pleading must indicate that there is an unknown defendant, and when the "true name" is discovered, the pleading may be amended accordingly. The Klosters attempted to substitute Fred Heany as Doe One by merely serving him with a summons and complaint. The Klosters, in turn, impliedly argue on appeal that the trial court committed error by refusing to consider service of process as successfully joining Heany as a defendant.

We agree with the trial court that the Klosters "placed the cart before the horse." The "cart" was service of process and the "horse" to be placed in front was a formal amendment to the complaint. CR 10(a)(2) directs the plaintiff to "amend" the complaint upon discovering a Doe's true name. Substitution of a true name for a fictitious party constitutes an amendment substituting or changing parties. *Kiehn v. Nelsen's Tire Co.*, 45 Wn. App. 291, 295, 724 P.2d 434 (1986). Thus, the rule is read in conjunction with CR 15(a), which provides that a party seeking to amend a pleading after the responsive pleading must do so only by leave of the court or by consent of the adverse party.

*Amendment of complaint.* The Klosters next contend the trial court erred in denying their CR 15 motion to amend their complaint to substitute Fred Heany as

"Defendant Doe One." CP at 1099. We review the trial court's application of the rules

for abuse of discretion. *See Burt v. Dep't of Corr.*, 168 Wn.2d 828, 832, 231 P.3d 191

(2010); *Gildon v. Simon Prop. Grp., Inc.*, 158 Wn.2d 483, 493, 145 P.3d 1196 (2006).

The trial court did not abuse its discretion when later denying the Klosters' motion

to amend their complaint to join Fred Heany as a new defendant. The Klosters filed the

motion on May 1, 2008, after the running of the three-year statute of limitations for suits

alleging fraud and misrepresentation. RCW 4.16.080. The statute of limitations

commences to run when the plaintiff knows, or in the exercise of due diligence should

have known, all the essential elements of the cause of action. *See In re Estates of

Hibbard*, 118 Wn.2d 737, 752, 826 P.2d 690 (1992). If the statute of limitations bars the

claim against Heany, the amendment serves no purpose. In determining a motion to

amend, the trial court may consider the futility of the amendment. *Watson v. Emard*, 165

Wn. App. 691, 699, 267 P.3d 1048 (2011).

The Klosters bought Lot 1 in February 2005 and filed suit in April 2005. Before

filing the original complaint in April 2005, the Klosters could have researched the record

title of Lot 1 and Pacific Rim Estates to determine if they held an enforceable easement.

The public record shows Heany as the developer of Pacific Rim Estates and the creator of

the easements on Lots 1 and 2 and Tract 2. The Klosters should have then known of the

failure of Heany to obtain the signature of Michael Fester on the plat.

The Klosters admit that, shortly after the filing of suit, they approached Fred

Heany, who claimed the easement was properly recorded. The Klosters either had or should have had information then to know that Heany was wrong. The trial court could reasonably conclude that the Klosters knew of any claim against Fred Heany by April 2005.

The Klosters argue that any amendment joining Fred Heany should survive the statute of limitations since the lawsuit was commenced timely. Under CR 15(c), an amendment adding a party may avoid the statute of limitations and relate back to the date of filing the suit, when the plaintiffs show that they timely sought an amendment, once they gained relevant knowledge. *Teller v. APM Terminals Pac., Ltd.*, 134 Wn. App. 696, 705, 142 P.3d 179 (2006). The moving party must also prove that any mistake in failing to timely amend was excusable. *Id.* at 705-06. Conversely, when the amendment is to add an additional defendant, inexcusable neglect alone is a sufficient ground to deny the motion. *Id.* at 706 (quoting *Haberman v. Wash. Pub. Power Supply Sys.*, 109 Wn.2d 107, 174, 744 P.2d 1032 (1988)). "If the parties are apparent or are ascertainable upon reasonable investigation, the failure to name them will be inexcusable." *Id.* "For example, failure to name a party in an original complaint is inexcusable where the omitted party's identity is a matter of public record." *Id.* at 707. The plaintiff's attorney is presumed to have researched and identified all potential parties with verifying information in the public record. *Id.*

Although the trial court did not indicate the basis for denial in the order denying the motion to substitute, this court may affirm on any basis supported in the record. *Deep Water Brewing, LLC v. Fairway Res., Ltd.*, 170 Wn. App. 1, 11, 282 P.3d 146 (2012). The evidence is more than sufficient to support the trial court's decision on the basis that the failure to name Heany in the original complaint was inexcusable. *Teller*, 134 Wn. App. at 706.

*Necessary party.* For the first time on appeal, the Klosters contend Fred Heany should have been joined under CR 19 as a necessary party because he was responsible for failing to record the access easement. "Necessary party" may be raised for the first time on appeal because a trial court lacks jurisdiction if all necessary parties are not joined. *DeLong v. Parmelee*, 157 Wn. App. 119, 165, 236 P.3d 936 (2010). A person must be joined as a necessary party if (1) a complete determination of the controversy cannot be made without that party and (2) the party claims an interest in the subject of the case that would be impeded by a judgment. CR 19(a); *DeLong*, 157 Wn. App. at 165. In determining whether a party is necessary, the court asks to what extent a judgment rendered in the party's absence might be prejudicial to him or to those already parties, and whether a judgment rendered in his absence will be adequate. *Gildon*, 158 Wn.2d at 495.

Fred Heany was not a necessary party. His participation in this suit was unnecessary for a complete determination of the controversy, which involves claims of

23

fraud, concealment, and misrepresentation. Heany transferred his interest in PRB to Blades in 1983 and made no representations at all to the Klosters. He testified at trial that he intended to create an easement over Tract 2 when he sold that tract to the previous owner. The trial court instructed the jury to consider Heany's intent in determining whether an easement was created. Although the Klosters claim Fred Heany admitted to fault for failing to obtain Michael Fester's signature on the plat, the Klosters do not explain their basis for recovery against Heany personally or how they were prejudiced by his absence as a party.

## PRB SUCCESSOR LIABILITY

The Klosters seek to impose liability upon Pacific Rim Brokers, Inc., as the successor to Fred Heany and Heany's sole proprietorship, Pacific Rim Properties. The Klosters argue that the issue of PRB's successor liability should have gone to the jury and the trial court should have adopted their proposed special jury instruction 16 on constructive or imputed knowledge. The Klosters wish to employ the jury instruction to argue that PRB, when acting as the broker during the sale from Roberts to the Klosters, knew of the defect in the easement, because knowledge held by Fred Heany is imputed to PRB.

Before trial, Judge Reynolds entered an order indicating that PRB was the successor in interest to Pacific Rim as the continuation and incorporation of Fred Heany and his associate, Robert Blades, doing business as Pacific Rim. During trial, Judge

Altman set aside Judge Reynolds' decision and entered an order dismissing PRB as a

matter of law. In granting PRB's motion, Judge Altman addressed the effect of the

previous ruling:

> Rulings were made previously based on a certain status of the file, which, as I indicated earlier, has changed in subtle ways now that we finally have the evidence of live under-oath witnesses.
>    I'm not going to allow Mr. Heany's error to be attributed to the defendant [PRB] in this case, so to the extent that that's a previous ruling based on the facts as I knew them at the time, or Judge Reynolds did, that has changed.

RP at 1141.

A trial court's order or ruling may be revised at any time before final judgment.

*Owens v. Kuro*, 56 Wn.2d 564, 566, 354 P.2d 696 (1960). Anyway, Judge Altman did

not alter Judge Reynolds' finding that PRB was the successor in interest of Heany's

*brokerage* business. Judge Altman ruled that PRB is not liable for mistakes Heany made

in his separate business as a *developer* of Pacific Rim Estates. The Klosters contend the

court erred in finding a distinction between Heany's brokerage business, known as

Pacific Rim Properties, and his separate business as developer of Pacific Rim Estates.

They argue that PRB is liable as a continuation of Heany's sole proprietorship, including

his activities as developer and as broker.

The Klosters cite *Cambridge Townhomes, LLC v. Pac. Star Roofing, Inc.*, 166

Wn.2d 475, 209 P.3d 863 (2009). *Cambridge* noted the general rule that a corporation

purchasing the assets of another corporation does not take on the liabilities of the selling

corporation. *Id.* at 481-82. One exception to this rule, however, is when the purchaser is a "mere continuation" of the seller. *Id.* at 482. Factors used by the court to determine whether a successor business is really just a continuation of the former business include whether there is a common identity between the officers, directors, and stockholders of the selling and buying companies, and the sufficiency of the consideration for the sale. *Id.* In the case of a sole proprietorship, which has no officers, directors, or shareholders, the court considers "the continuity of individuals in control of the business." *Id.* at 483. The objective of the test is to discern whether the purchasing company is merely a "'new hat'" for the selling company. *Id.* at 482 (quoting *Cashar v. Redford*, 28 Wn. App. 394, 397, 624 P.2d 194 (1981)).

The Klosters assert that while Fred Heany developed Pacific Rim Estates, he represented to the world that he acted for Pacific Rim Properties. They emphasize that Heany's letters to Klickitat County Commissioners, regarding the requirements for the long plat, were written on Pacific Rim Properties letterhead. Additionally, they note that the articles of incorporation for PRB state its purpose is "[t]o engage in the general business of brokering *and development* of real estate." Ex. 137, at 1 (emphasis added). These facts are not conclusive, however.

Mere use of a company's letterhead generally is insufficient to show that the letter writer is acting on behalf of the company. *See Griffin v. Union Sav. & Trust Co.*, 86 Wash. 605, 610-11, 150 P. 1128 (1915). The intent of the parties controls whether the

26

letter in effect "binds" the company. *Bailie Commc'ns Ltd., v. Trend Bus. Sys.*, 53 Wn. App. 77, 80, 765 P.2d 339 (1988); *see Griffin*, 86 Wash. at 610.

In this case, Fred Heany signed his name to these letters without any reference to representation of Pacific Rim Properties, and the letters themselves do not mention Pacific Rim Properties. Other letters written by Heany regarding development of the long plat were not sent on Pacific Rim Properties letterhead. At trial, he testified that he conducted his development activities independent of his brokerage activities for Pacific Rim Properties. Heany further testified that, despite language in the articles of incorporation, PRB never developed real estate. After he formed PRB with Robert Blades, his development activities prevented him from carrying out his brokerage duties for PRB, and that is why he sold his interest in PRB a year later to Blades. According to Robert Blades, the articles of incorporation were drawn up by an attorney who recommended including "development of real estate" in the purpose section "in case anybody wanted to do anything down the road," not because he and Heany intended to develop property for PRB. RP at 858.

The "continuity of individuals" test supports a conclusion that PRB is a continuation of the former brokerage sole proprietorship. *Cambridge*, 166 Wn.2d at 483. But the evidence also conclusively supports the trial court's conclusion that Heany's development activities were not performed for Pacific Rim Properties and were not intended to be incorporated in PRB. Consequently, the trial court did not err in rejecting

27

the Klosters' argument that PRB had successor liability for Heany's development activities for Pacific Rim Estates.

Any error in dismissing PRB was harmless. The jury ruled that the Klosters suffered no damages from any defect in the easement.

AMERI-TITLE LIABILITY

*Coinsurer.* Evidence showed that Ameri-Title was a local agent for First American and sold the First American title insurance policy to the Klosters. In the agency agreement with First American, Ameri-Title retained 90 percent of the premiums paid for a First American title policy and agreed to bear the first $3,500 of risk of loss on some policies written for First American. Ameri-Title prepared the preliminary commitment for title insurance that was supplied to the Klosters.

The Klosters contend Ameri-Title qualifies as an insurer under RCW 48.01.040, .050, and .070 and WAC 284-30-320. In 2009, Judge Reynolds granted a motion in limine preventing argument that Ameri-Title did not act as a title insurer. After presentation of the Klosters' evidence, however, the trial court granted First American's and Ameri-Title's motion to revise this interlocutory issue on summary judgment or under CR 56(d) (partial summary judgment). The trial court ruled that the Klosters could not assert a claim against Ameri-Title as an insurer, and therefore all claims on that basis were dismissed, including claims for breach of contract, breach of the duty to defend and indemnify, bad faith, and violations of the CPA.

Review of an order of summary judgment is de novo. *Campbell v. Ticor Title Ins. Co.*, 166 Wn.2d 466, 470, 209 P.3d 859 (2009). Summary judgment is appropriate if there are no genuine issues of fact and the moving party is entitled to judgment as a matter of law. *Id.*; CR 56(c). We also review a trial court's ruling on a CR 50(a) motion for judgment as a matter of law de novo, using the same standard applied by the trial court. *Davis v. Microsoft Corp.*, 149 Wn.2d 521, 530-31, 70 P.3d 126 (2003); *Hawkins v. Diel*, 166 Wn. App. 1, 13, 269 P.3d 1049 (2011).

Real estate title insurers in Washington are regulated under Title 48 RCW. *See* ch. 48.29 RCW. An "insurer" is defined generally in the statute as "every person engaged in the business of making contracts of insurance." RCW 48.01.050. A more detailed definition of "insurer" is supplied by former WAC 284-30-320(5) (1978): any individual or legal entity "engaged in the business of insurance, authorized or licensed to issue or who issues any insurance policy or insurance contract in this state." "Insurance" is defined as "a contract whereby one undertakes to indemnify another or pay a specified amount upon determinable contingencies." RCW 48.01.040. A title insurance agent is "a business entity licensed under the laws of this state and appointed by an authorized title insurance company to sell, solicit, or negotiate insurance on behalf of the title insurance company." RCW 48.17.010(16).

The difference between a title insurer and its agent, therefore, is that the title insurer enters into the contract with the insured to indemnify for certain losses, while the

agent enters into a separate contract with the insurer to sell, solicit, or negotiate insurance on behalf of the insurer. An agent, such as Ameri-Title, is not licensed to issue an insurance policy on its own behalf. *Id.* Ameri-Title's agreement to be compensated with a percentage of the premiums and to indemnify a portion of the loss paid by First American was negotiated with First American, not with the Klosters. *See Title Ins. Co. of Minn. v. State Bd. of Equalization*, 4 Cal. 4th 715, 842 P.2d 121, 126-27, 14 Cal. Rptr. 2d 822 (1993). First American remained solely liable to the Klosters for any covered loss. *Id.*, at 127. Consequently, the trial court did not err in concluding as a matter of law that Ameri-Title was not a coinsurer with First American on the Klosters' title insurance policy.

*Negligent misrepresentation.* At the conclusion of the Klosters' evidence, the trial court found "no evidence whatsoever" to support the claims against Ameri-Title, and dismissed them all. The Klosters contend Ameri-Title had a duty to investigate and disclose to them that the access easement shown on the short plat had not been recorded, and that the breach of this duty constituted negligence.

To support a prima facie case of negligent misrepresentation, the Klosters had to produce evidence that Ameri-Title negligently supplied them false information to induce a business transaction and that the Klosters justifiably relied on that false information. *Douglas v. Visser*, 173 Wn. App. 823, 833-34, 295 P.3d 800 (2013). The Klosters contend the "false information" here was the failure to inform them that the easement on

Tract 2 shown in the preliminary commitment document was unrecorded. Ameri-Title had no duty, however, to inform the Klosters of this fact.

A preliminary commitment does not represent the condition of the title, but is merely a statement of the terms and conditions by which the insurer is willing to issue its title policy. *Barstad v. Stewart Title Guar. Co.*, 145 Wn.2d 528, 536, 39 P.3d 984 (2002); *Courchaine v. Commonwealth Land Title Ins., Co.*, 174 Wn. App. 27, 36, 296 P.3d 913 (2012). Neither a preliminary commitment nor a title policy serves the purpose of an "'abstract of title'" which is a written representation, intended to be relied upon by the party who requested it, that gives constructive notice of all recorded conveyances or documents in the chain of title. *Courchaine*, 174 Wn. App. at 36 (quoting RCW 48.29.010(3)(b)). Because the preliminary commitment here was not an abstract of title, Ameri-Title had no duty to inform the Klosters that one of the easements on the attached short plat map had not been recorded. Furthermore, the preliminary commitment specifically excluded from coverage any easements shown on the short plat map.

The Klosters rely on *Sheridan v. Aetna Casualty & Surety Company*, 3 Wn.2d 423, 440, 100 P.2d 1024 (1940), when arguing that Ameri-Title voluntarily assumed the obligation to warn the Klosters of the inability to use an easement across the Rickeys' land. *Sheridan* was a personal injury accident against a liability insurer, who agreed with the owner of a building to inspect the premises and report the condition of the premises to the government authority. Any relevance to duties of a title insurer is distant. Whereas

31

First American Title may have wanted its agent to be more careful in researching

easements, this want created no duty to the Klosters, particularly when the commitment

excluded coverage for easements shown on the plat map.

### FIRST AMERICAN TITLE INSURANCE COMPANY EXTRACONTRACTUAL LIABILITY

The Klosters seek recovery against the title insurance policy issuer, First American

Title, for breach of a duty to defend, bad faith, violations of the unfair claims settlement

practices regulations, violations of the CPA, and breach of the title insurance contract.  In

this context, the claims of bad faith, violations of the regulations, and violations of the

CPA are coextensive.

After the Klosters rested their case, the trial court granted First American's CR

50(a) motion for judgment as a matter of law and dismissed the claims.  Our review of a

CR 50(a) judgment is de novo, viewing the evidence in the light most favorable to the

nonmoving party. *Hawkins*, 166 Wn. App. at 13.  Judgment as a matter of law is

appropriate if we can say that there is neither substantial evidence nor reasonable

inference to sustain a verdict for the nonmoving party. *Id.* (quoting *Sing v. John L. Scott,*

*Inc.*, 134 Wn.2d 24, 29, 948 P.2d 816 (1997)).  We address each claim in the order above.

*Breach of duty to defend.*  Under Section 4 in the title insurance policy, First

American agreed to defend, at its own costs, against third party claims "adverse to the

title" to the Klosters.  Ex. 95, at 3.  The Klosters contend First American had a duty to

defend their claim that they had an access easement across Tract 2 and that First American held a conflict of interest since it also insured the purchase of Tract 2 by the Rickeys. First American responds that no duty to defend arose because the Rickeys never filed suit against the Klosters, and because the Klosters had no coverage for the purported easement.

The duty to defend is triggered whenever an insurance policy conceivably covers the allegations of a complaint filed against the insured. *Campbell*, 166 Wn.2d at 471. "The duty to defend arises whenever a lawsuit is filed against the insured alleging facts and circumstances arguably covered by the policy." *Kirk v. Mount Airy Ins. Co.*, 134 Wn.2d 558, 561, 951 P.2d 1124 (1998). "The triggering event is the filing of a complaint alleging covered claims." *Griffin v. Allstate Ins. Co.*, 108 Wn. App. 133, 138, 29 P.3d 777 (2001).

The Rickeys have not filed a lawsuit against the Klosters and have not sued to quiet title. The Klosters contend the duty to defend extends, however, to any legal action necessary to establish title. Although unclear in their brief, they may contend First American had a duty under Section 4 to file an action to quiet title in the unrecorded easement. The Klosters cite no case that supports their assertion and we find no case. We will not rewrite the insurance contract to impose a duty on the title insurer to "clear title" when the title policy imposes no such obligation but merely obliges the insurer to

indemnify for losses not exceeding the policy limits. *Sec. Serv., Inc. v. Transamerica Title Ins. Co.*, 20 Wn. App. 664, 669-70, 583 P.2d 1217 (1978).

Moreover, the duty to defend does not arise if the alleged claim clearly is not covered by the policy. *Kirk*, 134 Wn.2d at 561. As we discuss below, the title policy here excludes coverage of any road easement on Tract 2.

*Bad faith/violations of the unfair claims settlement practices regulations.* An insurer has a duty of good faith to its insured, and violations of that duty may give rise to tort actions for bad faith. *Smith v. Safeco Ins. Co.*, 150 Wn.2d 478, 484, 78 P.3d 1274 (2003); *Rizzuti v. Basin Travel Serv. of Othello, Inc.*, 125 Wn. App. 602, 615, 105 P.3d 1012 (2005). Under RCW 48.30.010(1), an insurer "shall not engage in unfair methods of competition or in unfair or deceptive acts or practices" as defined by the statute and its regulations, found in WAC 284-30-300 through -800. Violations of these standards constitute a breach of the insurer's duty of good faith. *Rizzuti*, 125 Wn. App. at 616.

WAC 284-30-330 identifies specific unfair claims settlement practices. The Klosters allege the following violations: misrepresentation of pertinent facts or policy provisions (WAC 284-30-330(1)) and denial of coverage without a reasonable and prompt investigation (WAC 284-30-330(3), (4), (6)). According to the Klosters, First American misrepresented facts when it failed to reveal until a year after it filed its claim report that its first investigation of the Klosters' claim indicated agent "irregularity/omission" caused the dispute between the Klosters and the Rickeys.

34

Ex. 154. Nevertheless, the claim report drew no such conclusion, but only characterized the claim of the Klosters.

The Klosters also argue that First American's initial claim report did not deny coverage, and thus First American's eventual denial of coverage is evidence of bad faith. Nevertheless, whether the initial internal report failed to document a denial of coverage is immaterial. First American, from the inception of the dispute, consistently informed the Klosters that it denied coverage, in part because the Klosters had access over other land. An insured does not establish bad faith when the insurer denies coverage based on a reasonable interpretation of the policy. *Am. Best Food, Inc., v. Alea London, Ltd.*, 168 Wn.2d 398, 412, 229 P.3d 693 (2010).

"To prevail on a claim of bad faith denial of coverage, the insured must come forward with evidence that the insurer acted unreasonably." *Rizzuti*, 125 Wn. App. at 616. Once the insurer shows a reasonable basis for its action, the insured can raise an issue of fact by presenting evidence that the insurer's alleged basis was not the real reason for its decision to deny coverage. *Id.* at 616-17; *see also Smith*, 150 Wn.2d at 486. First American provided a reasonable basis for denial, and the Klosters failed to show that First American's stated reasons for denial were not the actual reasons.

The Klosters established at trial that First American employees did not receive training on specific regulations of the unfair claims settlement practices regulations. Nor did First American maintain internal rules regarding the handling of claims. These facts

35

could support a claim that First American did not adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies in violation of WAC 248-30-330(3). Ultimately they did not show, however, that this lack of training led to any delay in a prompt investigation, nor that any delay harmed the Klosters.

*Violations of the Consumer Protection Act.* The Klosters contend that violations of the unfair claims settlement practices regulations also violate the CPA, chapter 19.86 RCW. To prevail on a CPA claim, the plaintiff must show (1) an unfair or deceptive act, (2) in trade or commerce, (3) impacting the public interest, and that (4) the plaintiff suffered a business or property injury (5) caused by the unfair or deceptive act. *Courchaine*, 174 Wn. App. at 44-45. A violation of the unfair claims settlement practices regulations can constitute a violation of the CPA. *Shields v. Enter. Leasing Co.*, 139 Wn. App. 664, 675, 161 P.3d 1068 (2007). Since the Klosters failed to show violations of the unfair claims settlement practices regulations and otherwise failed to present evidence of First American's breach of the duty of good faith, the trial court did not err in dismissing their claims of violations of the CPA as a matter of law.

TITLE INSURANCE POLICY COVERAGE

In its cross appeal, First American Title Insurance Company contends the trial court erred when ruling, as a matter of law, that the Klosters had coverage under the title policy for an incomplete access easement. We agree and reverse.

The trial court agreed with First American that (1) its title policy insured against loss resulting from the right to access or legal access from a public road; (2) the title policy did not insure any specific easement; (3) the Klosters have legal access to their land across the southern 30 feet of Lot 2 and the eastern 30 feet of Lots 5, 6, and 7 of Pacific Rim Estates; (4) Schedule A to the policy, which includes the description of the land insured by the policy, does not include any property beyond its bounds; (5) the unrecorded purported easement over the northern 30 feet of short plat Tract 2 is outside the Pacific Rim Estates plat; and (6) Schedule B excludes all specific easements in the Pacific Rim Estates and short plat Tract 2. The trial court, nonetheless, ruled that the partial plat map attached to the policy created an ambiguity. The court reasoned that the average person purchasing insurance would not reasonably glean that the additional access easement was not within the definition of access contained elsewhere in the policy. Therefore, the trial court ruled as a matter of law that the policy insured against the unavailability of the easement across the Rickey property, since it had to read any ambiguity in favor of the insured.

*Waiver of cross appeal.* Before we reach the merits of First American's cross appeal, we must address the Klosters' contention that First American waived its appeal since it did not assign error to the trial court's finding that the Klosters' title to Lot 1 was defective or to Judge Reynolds' order that the title policy access coverage was ambiguous. According to the Klosters, First American has appealed only the trial court's

37

denial of its motion to set aside Judge Reynolds' pretrial order that the title policy access coverage was ambiguous, and First American is appealing only from the second of the trial court's orders refusing to set aside Judge Reynolds' pretrial order, not the third and final ruling.

We read First American's brief as assigning error to the findings of fact, in addition to the legal ruling that the policy covered the missing easement because of the attached map. We know of no rule that requires an appellant to challenge each time a trial court repeats the same ruling. We may also excuse a party's failure to assign error to specific findings if the briefing makes the challenge clear. *Noble v. Lubrin*, 114 Wn. App. 812, 817, 60 P.3d 1224 (2003). We know what First American is appealing and, thus, we reach the merits of the cross appeal.

*Title policy coverage.* Interpretation of an insurance policy is a matter of law and is reviewed de novo. *Butzberger v. Foster*, 151 Wn.2d 396, 401, 89 P.3d 689 (2004); *Courchaine*, 174 Wn. App. at 43. The policy is construed as a whole, giving effect to each clause. *Id.* Policy language must be interpreted so that it is consistent with the way an average person would understand it. *Greer v. Nw. Nat'l Ins., Co.*, 109 Wn.2d 191, 198, 743 P.2d 1244 (1987); *Courchaine*, 174 Wn. App. at 43. If a clause in the policy is ambiguous, the clause will be interpreted in the insured's favor. *Capitol Specialty Ins. Corp. v. JBC Entm't Holdings, Inc.*, 172 Wn. App. 328, 335, 289 P.3d 735 (2012). "That is especially so in the context of exclusionary clauses." *Id.* A clause is ambiguous if it is

38

fairly susceptible of two reasonable interpretations. *Greer*, 109 Wn.2d at 198. When the language is clear and unambiguous, however, the court may not create an ambiguity. *Courchaine*, 174 Wn. App. at 43.

The First American title policy insured against loss or damage sustained or incurred by the insured by reason of a "[l]ack of a right of access to and from the land." Ex. 95, at 1. Schedule A describes the "land" covered as "Lot 1, PACIFIC RIM ESTATES." Ex. 95, at 4. Since the Klosters gained, upon their purchase, legal and actual access to their land, regardless of the absence of an easement across the Rickeys' land, their claim does not fulfill the policy inclusory language.

The First American policy also excluded coverage three times over. Schedule B excluded from coverage, "Easements, claims of easement or encumbrances which are not shown by the public records." Ex. 95, at 5. Specific exceptions related to the unrecorded easement on the northern 30 feet of Tract 2:

> 5. Easements, Conditions, Restrictions and Reservations, including the terms and provisions thereof, as contained in Short Subdivision filed as Auditor's File No. 167997, Klickitat County Short Plat Records.
> . . . .
> 8. Conditions, Restrictions, Easements for roadways and Utilities and disclosure regarding maintenance of roads, including the terms and provisions thereof, as shown on the Plat recorded December 1, 1981 in Book 5, Pages 31 and 32, Klickitat County Plat Records.

Ex. 95, at 6. The map sketch attached to the title policy is a portion of the short plat map in Auditor's File No. 167997 and shows various easements, over the short subdivision known as WS-146, including the unrecorded easement on Tract 2. Also, exclusion 8 referred to easements for roadways as shown on the plat in Book 5, pages 31 and 32, of the county records, which is the same plat referred to in Schedule A's description of the property.

The trial court concluded that the "unfortunate plat map appended to the policy" created an ambiguity of coverage because an "average person could reasonably conclude that the title policy for Lot 1, Pacific Rim Estates, covers access outside the plat across the northern 30-feet of the Rickey parcel, Tract 2," and the policy "both references the mistaken easement by attachment and guarantees coverage to 'access.'" CP at 4613. The Klosters' own testimony contradicts this conclusion. Karl Kloster was asked at trial if the title policy exceptions included the property containing Tract 2 and he replied, "I guess." RP at 1072. He was also asked if he relied on the short plat sketch attached to his title policy as a representation of what was covered in the policy. He replied that he would never rely on a sketch because he knew the difference between a sketch and a recorded short plat. Karl Kloster further explained that he did not rely on the sketch of the plat because it had a disclaimer at the top. This disclaimer noted the map was provided as a courtesy and does not constitute a part of the title policy. We wonder how the title company could have more clearly communicated to the reader that any easements

depicted on the sketch are not guaranteed. We assume that Karl Kloster agrees he is a reasonable person capable of reading and understanding the language of the policy.

With the inclusory language, the exclusionary clause, and the disclaimer on the map, the average person would not assume that easements shown on the plat sketch were covered in the Klosters' title policy. With the disclaimer, the map is not sufficient to rebut what the trial court recognized is the unambiguous language of the policy.

A decision of limited relevance is *Havstad v. Fidelity National Title Insurance Company*, 58 Cal. App. 4th 654, 68 Cal. Rptr. 2d 487 (1997). The Havstads, upon purchasing the insured property, began use of a strip of neighboring land for access. The strip was delineated on a subdivision map as "not a public street." One of the neighbors sued the Havstads for trespass and the Havstads tendered the defense of the suit to the title company. The California Court of Appeals affirmed a summary judgment ruling in favor of the title company on the ground that the title company has no duty to defend when a claim is not covered.

Fidelity National Title Insurance Company's policy read similarly to the First American Title Insurance Company's policy. The policy insured against loss by reason of "lack of a right of access to and from the land." *Id.* The insured property was the property purchased by the insured and did not extend to land outside its boundaries. Nevertheless, the policy referenced the subdivision map that contained the "not a public street" notation across a portion of the neighboring lands. *Id.* The Havstads argued that

coverage extended to an easement for the street because of the reference. The court disagreed, stating that the insured's position contradicted the plain language of the policy that described the covered property as only that within the legal description of the insured's land.

Our trial court erred in concluding that the title policy was ambiguous and therefore covered a "defect" in the title caused by the Klosters' inability to use the unrecorded easement on Tract 2. The judgment against First American is therefore reversed.

First American Title also cross appeals the jury award of the cost of cure as damages, contending the measure of damages should be the decrease in the Klosters' property value resulting from the missing easement. In turn, the Klosters appeal the trial court's decision limiting their damages to the cost to cure. Finally, First American Title also cross appeals the trial court's award of reasonable attorney fees and costs to the Klosters, and the Klosters appeal the limited amount of fees awarded them. Because we hold judgment should have been entered in favor of First American Title, not the Klosters, we reverse the jury award and need not address the correct measure of damages or the elements of damages available. We also reverse the award of reasonable attorney fees and costs in favor of the Klosters against First American Title and do not address whether the trial court's award should have been higher.

ATTORNEY FEES

The sale agreement between Schenectady Roberts and the Klosters stated, "If the Buyer, Seller, or any real estate licensee or broker involved in this transaction is *involved in any dispute relating to this transaction*, any prevailing party shall recover reasonable attorneys' fees and costs." CP at 3744 (emphasis added). The Klosters contend the trial court erred when awarding PRB and Roberts fees because their claim was not for a breach of contract but for misrepresentation and concealment. They rely on *Boguch v. Landover Corp.*, 153 Wn. App. 595, 609-10, 618-19, 224 P.3d 795 (2009), for the proposition that there is no right to recover attorney fees based on contract when the claim is based on negligence. The Klosters do not object to the high amount of the fees and costs.

When determining whether to award fees under a contract clause, the court must focus on the language of the clause. *See Belfor USA Grp., Inc., v. Thiel*, 160 Wn.2d 669, 671, 160 P.3d 39 (2007); *Hindquarter Corp. v. Prop. Dev. Corp.*, 95 Wn.2d 809, 815, 631 P.2d 923 (1981). The fee provision in *Boguch* was narrow and limited to actions "to enforce any of the terms of this Agreement." *Boguch*, 153 Wn. App. at 607. The Klosters' contract clause was broader.

An analogous case is *Brown v. Johnson*, 109 Wn. App. 56, 58-59, 34 P.2d 1233 (2001). In *Brown*, the court held that a property buyer's tort misrepresentation claim was properly a basis for an attorney fees claim under a real estate purchase and sale

43

agreement. *Id.* at 59. The fee provision in the agreement applied to any "suit concerning this Agreement." *Id.* The court held that the buyer's misrepresentation claim was "on [the] contract" because it arose "out of the parties' agreement to transfer ownership of [the property]" and the sale agreement was central to the buyer's claims. *Id.* at 59. The Klosters' misrepresentation and concealment claims also arose out of the agreement by which Roberts sold property to them. The Klosters' own complaint prayed for an award of attorney fees under the sale agreement.

The Klosters also contend the trial court could not award Roberts and PRB fees because the statutory warranty deed that Roberts gave the Klosters superseded the sale agreement. Therefore, they argue that the sale agreement merged into the statutory warranty deed and the attorney fees clause was extinguished. The sale agreement specifically read, however, that "[a]ll terms of this Agreement, which are not satisfied or waived prior to closing, shall survive closing. These terms shall include, but not be limited to, representations and warranties, attorneys fees and costs, . . . etc." CP at 3745. Thus, the trial court properly awarded reasonable attorney fees and costs to Roberts and PRB as provided in the sale agreement.

We also award reasonable attorney fees and costs, on appeal, to Roberts and PRB. RAP 18.1 permits the prevailing party to recover reasonable attorney fees incurred on appeal if the party was entitled to attorney fees at trial. *Landberg v. Carlson*, 108 Wn. App. 749, 758, 33 P.3d 406 (2001).

44

No. 30546-5-III
*Kloster v. Roberts*

## CONCLUSION

We reverse the judgment entered against First American and affirm the remaining decisions of the trial court. We award Schenectady Roberts and PRB reasonable attorney fees and costs incurred on appeal.

Reverse and affirm.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Korsmo, C.J.

_____
Kulik, J.P.T.

45



(509) 493-1965
Fax: (509) 493-1905
PO Box 735 - 165 NE Estes
White Salmon, WA 98672

ANY SKETCH ATTACHED HERETO IS DONE SO AS A COURTESY ONLY AND
IS NOT PART OF ANY TITLE COMMITMENT OR POLICY. IT IS
FURNISHED SOLELY FOR THE PURPOSE OF ASSISTING IN LOCATING
THE PREMISES AND FIRST AMERICAN EXPRESSLY DISCLAIMS ANY
LIABILITY WHICH MAY RESULT FROM RELIANCE MADE UPON IT.

034